Statement of the Case.
MONROE, J.
Plaintiff brings this suit as the administrator of the succession of Adelaide Landry, deceased wife of Louis Deleambre, for the resolution for nonpayment of price of a sale made during the life of the decedent of a certain plantation, and he prays that other sales of, and transactions affecting, said plantation made and entered into after the death of the decedent be decreed null, or, in the alternative, that he have judgment against the original vendee for the price of the property, with interest, attorney’s fees, etc. The facts out of which the. litigation arises we find to be as follows, to wit:
Louis Deleambre and his wife were married under the régime of the community, and during the marriage acquired the plantation in question, which on January 3, 1883, Deleambre sold to their son-in-law, Frederick Hebert, for $6,500, represented by six notes (five for $1,000 each and one for $1,500), payable in from one to six years, respectively, with interest, and secured by mortgage and vendor’s lien, with the usual stipulations as to attorney’s fees, etc. Some time after (during the life of Mrs. Deleambre, but precisely at what date does not appear) Hébert bought machinery to be used for the manufacture of sugar on the plantation so purchased by him, and borrowed the money with which to pay for it from a gentleman to whom Deleambre obligated himself as surety for the debt, and to whom he delivered as collateral one or more (probably two) of the notes that he had received from Hébert. Hébert also, and for several years (still during the life of Mrs. Deleambre), obtained advances for planting purposes from Pierre Le Bron, a merchant in New Iberia, and his father-in-law, in that case as in the other, bound himself as surety for the debt, and from time to time, as the debt increased, gave Le Bron one of Hebert’s mortgage notes as collateral therefor, the fact being that Hébert was uniformly unsuccessful in his business operations, that he was insolvent almost from the beginning, and (it may ás well be stated here) that he did not at that time or eventually pay anything on the notes to which we have referred.
Mrs. Deleambre died on December 20, 1801, leaving as her heirs (issue and descendants from her marriage with Louis Deleambre) her (major) sons, Désiré and Laodice, her (married) daughters, Mesdames Dessan, Viator, and Hébert, and her grandchildren (children of her predeceased daughter Elina, or Evina, formerly the wife of Luzin Miguez), to wit, Azeme (wife of Oscar Broussard), Menora (wife of Jos. Rodriguez), Dominique (now the administrator, plaintiff herein), Orézile, Cecilia (wife of Theo. David), Honora, Honoré, and Alfred. Of those grandchildren Alfred was born November 13, 1881, and Cecilia November 22, 1883, so that the latter *179 could hardly have been married when her grandmother died. When the others were born is not shown, but it is likely that Honora and Honoré, as well as Alfred and Cecilia, were minors at that time. The estate of the decedent appears to have consisted exclusively of her interest in the community, save a matter of $1,038.77, which she had inherited from her parents and had turned over to her husband; and, so far as we have been able to discover, she owed nothing, and her estate was charged with no debts, save a few items, aggregating $110, for funeral -expenses, which were subsequently paid. On August 5, 1893, Louis Delcambre presented a petition to the district court, alleging the death of his wife, further alleging that an inventory should be made and an administrator appointed, and praying that his application for administration be advertised, and the inventory was ordered and made, the original, filed December 11, 1893, showing community property to the value of $17,510.90, and a supplemental inventory, made on April 17, 1894, showing, as belonging to the community, the mortgage notes and another note made by Hébert, a note made by Joseph Viator, and a note made by Laodice Delcambre, the whole appraised at $11,320. The applicant appears to have taken the oath, given bond, and received his letters, as administrator, in December, 1S93, and he proceeded to administer the estate, and filed an account, which was homologated by judgment of date May 19, 1894, and by which he was recognized as surviving husband in community, entitled, in his own right, to an undivided half interest in the property of the community, and, as usufructuary, to the enjoyment of the other half interest. In the meanwhile he had made an arrangement with Le Bron with reference to the debt for which he was bound for account of Hébert, as a result of which Le Bron had advanced the money required to pay the amount due to the gentleman who had made the loan for the purchase of the machinery, and Delcambre had executed a notarial act in which he acknowledged that he owed Le Bron an aggregate of $4,788.74, represented by notes bearing interest at 8 per cent, on which he and Hébert were bound in solido; and declared that as security for said notes he delivered to Le Bron the mortgage notes which he had received from Hébert. How much of the debt thus acknowledged was incurred before and how much after the death of Mrs. Delcambre the evidence does not show, but it seems reasonably certain that nothing of consequence, save the running interest, was added thereto. On the other hand, nothing thereafter was paid, and, after waiting for several years, Le Bron became dissatisfied with the mortgage notes held by him as collateral, and which were by that time some 10 or 15 years past due, and threatened suit unless fresher securities were furnished. It was thereupon agreed, upon the advice of counsel, that Delcambre should foreclose the mortgage securing the notes thus held by Le Bron, that the property should be adjudicated to Hébert, and that the latter (the old mortgage being canceled) should give Le Bron new notes, secured by a new first mortgage, for the amount due him, and should give to Delcambre a second mortgage to secure the amount represented by the old notes, with accumulated interest. Delcambre accordingly obtained executory process, under which on September 24, 1898, the plantation was adjudicated to Hebert, who paid nothing for it, and the sheriff executed a deed conveying the property to him, and reciting that the price had been paid in cash. Thereafter, on September 27, 1898, Hébert executed an act giving a first mortgage on said property to secure three promissory notes, aggregating $7,591.31, payable to his own order and by him indorsed in blank, which, the act recites; *181 he delivered to Le Bron in reimbursement of money which had been loaned by that gentleman. And on the same day he executed another act, giving a second mortgage on the property to secure three notes aggregating $16,223.32, which, the act recites, he delivered to Deicambre in reimbursement of money borrowed from him. On January 12, 1900, Hebert executed an act of sale of the plantation to Deicambre for $15,000 cash, though nothing was really paid, and about the same time he gave Deicambre a confession of judgment (which was never entered, because it was considered of no value) for $10,600.27 representing the difference between' the price thus fixed and the total amount of his indebtedness. Deicambre then leased the plantation to his sons, Désiré and Laodiee, on condition that they would do something towards redeeming it from the run-down state into which it had fallen, would pay the taxes and the interest on the debt due to Le Bron. Four years later, Le Bron having died, his sister and heir, Miss Marie Le Bron, caused executory process to issue on the notes which had been held by him, and the plantation was on October 15, 1904, adjudicated to Desiré and Laodiee Deicambre for $11,050 cash, of which amount $915.33 was appropriated to the payment of costs and attorney’s fees, $7,-643.83, to the payment of the debt due Miss Le Bron, and the balance, of $2,490.84, was turned over to Louis Deicambre. In the meanwhile, probably in 1902, Dominique Miguez (now before the court as administrator) had instituted a suit alleging that there had never been any order of court appointing his grandfather administrator of his grandmother’s succession, making various charges concerning the manner in which the estate had been handled, and praying that he be appointed administrator, which suit was dismissed in the district court on a plea of res judicata, based upon the judgment homologating the supposed administrator’s account. The judgment of the district court was, however, reversed in this court, on the ground that the plaintiff, as one of the heirs, had received no notice of the filing of the account, and was not bound by the judgment relied on. Miguez v. Delcambre et al., 109 La. 1090, 34 South. 99. The matter, having been tried on its merits in the district court, came to this court again, and it was held that, there being no evidence of any order of court authorizing the issuance of letters of administration to the defendant, the letters were of no effect, and that the application of the plaintiff should be advertised. Miguez v. Delcambre, 113 La. 61, 36 South. 8S8. Upon the third appearance of the litigants, it appeared that certain oppositions to the appointment of plaintiff had been ‘’disallowed” in an interlocutory proceeding, and it was held that they “should be tried with the original application and all the issues involved determined in one judgment.” Miguez v. Delcambre et al., 114 La. 1032, 38 South. 820. Upon the last appearance of the parties (prior to this), the judgment of the district court, in so far as it appointed plaintiff administrator, was affirmed, but in so far as it denied that Louis Deicambre was entitled to the usufruct of his deceased wife’s estate was reversed, and that question was left open for further consideration; the court saying (to quote the syllabus of the opinion): “If the question complained of be satisfactorily accounted for, it will then be time enough to decide whether or not the husband is entitled to the usufruct of one-half of the community property.” Miguez v. Delcambre et al., 118 La. 1062, 43 South. 703.
The present suit was instituted on January 7, 1908, and plaintiff alleges, in substance, that the heirs of Mrs. Deicambre accepted her succession with benefit of inventory, save Désiré and Laodiee Deicambre, who accepted unconditionally; that Louis Deicambre had possession of his deceased *183 wife’s estate, fraudulently pretending that he had been appointed administrator; that about 1893 and thereafter he and Hébert became indebted to Le Bron, and gave him the mortgage notes, which had been executed by Hébert in 1883, as security for their, debt, though Le Bron well knew that Delcambre had no authority to pledge them; and that, in 1S98, in deliberate fraud of the rights of the succession of Mrs. Delcambre and by prearrangement between Delcambre, Hébert, and Le Bron, Delcambre provoked the pretended sale to Hébert and consented to the cancellation of the mortgage by which Hebert’s notes were secured, though, in truth, no real sale was made, the whole proceeding having been a sham, the purpose of which was to defraud the succession of Mrs. Delcambre by canceling the existing mortgage and vendor’s lien (securing the notes belonging to the community between Delcambre and his deceased wife), and giving Le Bron a first mortgage to secure the notes then delivered to him. Plaintiff further recites the subsequent proceedings, which have been stated, and alleges that the adjudication of the property to Désiré and Laodlce Delca’mbre is null because the adjudicatees had full knowledge of, and were parties to, all the aforementioned transactions, as well as other matters concerning the de facto administration of Louis Delcambre, and were defendants with him in the then pending suit of Dominique Miguez v. Louis Delcambre et al., in which all of the said matters, simulations, and fraud were in question; that the estate of Adelaide Landry is insolvent, and the recovery of its assets is necessary in order to enable plaintiff to pay its creditors; that, as administrator, he has offered to return to Hébert the notes given by him for the purchase price of the property in question, and has requested him to consent to a resolution of 'the sale, and that Hébert has declared that he neither could nor would give such consent, expressly waiving a more formal tender.
Wherefore, he prays that Louis, Désiré, and Laodice Delcambre, and Frederick Hébert and Miss Marie Le Bron, be cited, and that there be judgment in his favor “as administrator of the estate of Adelaide Landry,” resolving the sale by Louis Delcambre to Frederick Hébert of January 3, 1883, decreeing the plantation in question “to belong to said estate and the community which existed between the said Delcambre and his wife, free from any lien or mortgage, which may have been subsequently placed thereon, or any alienation, made thereof, and subject .to the creditors and heirs of said community and estate and the payment of its debts,” further decreeing all such mortgages, liens, and alienations to be simulated or fraudulent, or both, and condemning the defendants,1 respectively, for rents and revenues in certain specified amounts, “and, in the alternative, that the sale cannot be resolved” ; that there be judgment decreeing said Hébert to be indebted to the estate of Adelaide Landry in the sum of $6,500, with interest and attorney’s fees, etc., and that the mortgage and vendor’s privilege, securing said amount be recognized and all other mortgages purporting to take precedence of it he decreed fraudulent and void; and, further, that, if any effect bo given to the notes and mortgage of September 27, 1898, they be decreed to be aeld by Louis Delcambre for “said estate and former community,” and as representing the debt “due to said estate, and that said mortgage and vendor’s lien of said estate be decreed to rank and prime any mortgage on said estate whatever, and to be in full force, and executory, and, in the alternative, that neither relief above prayed for is granted him, then petitioner prays that he have judgment in his said capacity as administrator against said Louis Delcambre, in the full sum of $G,500,” with interest, costs, and at *185 torney’s fees, as stipulated in the act of sale and mortgage of January 3, 1883.
The defendants Louis, Désiré, and Laodice Delcamhre filed certain exceptions, which were overruled, and to which we will refer hereafter, and all the defendants joined in the plea of prescription. All the defendants then answered, alleging that the debt for which the notes were originally given by Hébert were pledged was a debt of the community, and hence that the community lost nothing by reason of the arrangements complained of, which were made by the master of the community and all other parties concerned in good faith; and that Louis Delcambre having accounted for said original notes, and his account having been homologated, the matter is a thing adjudged, and that the rights of the plaintiff are limited to a settlement of said account. They further answer setting up a claim for taxes and improvements in the event of an adverse judgment upon other points.
The learned counsel by whom defendants are represented, and who conducted the proceedings in the matters of Mrs. Delcambre’s succession, testified on a previous occasion (and his testimony has been again introduced) that he pursued the usual course in such matters, and is quite confident that an order for Delcambre’s appointment as administrator was obtained, and he further says:
“Mr. Delcambre, who acted entirely upon my advice, had no possible way of doubting but that everything had been regularly done. * * * In reference to the Le Bron transaction, that person who was my client gave me for collection the claim against Fred Hébert, represented by various notes and possibly by an open account. Mr. Le Bron was very positive in wanting these claims put in some fresh form, if not paid, and he stated he would consent to the taking of first mortgage notes, on the property, but wanted fresh obligations and first mortgage. He gave me the notes, which he had in pledge, for proceeding against the property of Fred Hébert. There were two mortgage notes which he had from Mr. Delcambre as collateral. I issued execution on those notes, .in the name of Louis Delcambre, who, with Hébert, had accepted the proposition of a renewal of the obligations by the giving of the collateral as security in the manner exacted by Le Bron.”
The defendant himself testified that he never whilst acting as administrator entertained any doubt as to the fact or the legality of his appointment, and neither knew nor heard of any question upon the subject until he was first sued by plaintiff. He further testified that he was 84 years of age; that he obligated himself for Ilébert’s account upon the solicitation of his wife, who was very fond of Hébert and urged witness not to abandon him, saying: “He will get over it, and pay you back.” 1-Ie also testified that it was Pierre Le Bron who forced him to seize the property because Hébert was not paying the interest on the debt due by them,. and otherwise' his testimony is to the effect that, having incurred the obligations in behalf of Hébert before the death of his wife, he endeavored after her death to make the best arrangements in regard to them that he was able.
The judge a quo says (inter alia):
“They [the notes originally given by Hébert, as representing the price of the plantation] were * * * furnished by Louis Delcambre for various debts of Frederick Hébert. During that time, and for many years, Hebert was heavily indebted, and for which the estate and Delcambre became involved as sureties through various transactions and growing out of other transactions and suretyship incurred by Delcambre as head of the community prior to the death of his wife. Hébert was at the time hopelessly involved, which prompted and forced Delcambre to make those transactions and to devise ways and means to extricate himself and the estate from the various liabilities incurred by Hébert. It was then that those transactions and deeds, treated as frauds and simulative by plaintiff, were entered into and executed. * * * Other matters were also transacted and entered into in order to accomplish and carry out those different sales and mortgages, and also for the purpose of liquidating said indebtedness. They were' entered into and performed at a time unsuspicious and when harmony and good will prevailed among them all. They were transacted and executed in perfect good faith and in the same manner and form as any other legal business transaction. There is nothing in the record to lead me to believe otherwise. No fraud has been proven, and I cannot presume that there was any. Nor is *187 there any evidence in the record to prove simulation. Some of the transactions, including the sale of the property by Louis Deleambre to Hébert, were entered into before the death of the wife of Louis Deleambre in 1891, and some after her death, when they were concluded. The matters were no doubt transacted with no other purpose [than that] of liquidating said indebtedness of the community, and were resorted to because they were being threatened by Le Bron to have the notes he held as collateral seized to satisfy the debt due him. To prevent this, those arrangements or compromises were made and entered into by the parties.”
And he gave judgment rejecting plaintiff’s demand and dismissing the suit.
Opinion.
The exceptions filed by defendants Louis, Désiré, and Laodice Deleambre are as follows:
“(1) That the plaintiff, administrator, * _ * * is without right and authority to bring this action, unless he joins all the heirs and the surviving husband.
“(2) Tender is a condition precedent to instituting suit; and defendants aver that no tender was ever made, or can be made.
“(3) Defendants aver that the original parties to the sale have changed their positions, for the reason that defendant L. Deleambre is a half owner in indivisión, and does not wish to rescind the same; and, moreover, in the dissolution of the sale, he should be made a party plaintiff, and as such he refuses to be joined.
“(4) No right or cause of action.”
1. Considering these exceptions merely with reference to the right of the administrator to bring a suit of this character-without being joined by the heirs, we are inclined to think that the petition discloses a cause of action, since it alleges that the succession owes debts, and the purpose of the suit is to recover assets which might be available for their payment, and which, it is said, have been diverted through fraudulent transactions, to which all the defendants were parties. The case has, however, now been tried, and the only evidence that we find in the record tending to show that the succession ever owed anything is that furnished by the account filed by the defendant, as administrator, from which it appears that there was originally charged against the succession the sum of $110 for the funeral expenses of the decedent and for an anniversary sermon — the whole of which, as we take it, was paid long before the present administrator was appointed. We are therefore of opinion that he (the present administrator) has now no other function to discharge than to turn over the assets of the estate, whether they consist of tangible property or of claims against the community, or whatever else they may be, to the heirs. In Succession of Hasley, 27 La. Ann. 592, it was said:
“There are no debts due by the estate. The administration should be closed, and the property should be turned over to those entitled to it as soon as possible.”
In Ledoux v. Burton, 30 La. Ann. 580, Mr. Justice Spencer, as the organ of the court, said that the administrator (of a deceased wife’s succession) could not maintain an action to recover real estate which had belonged to the community and had been disposed of by the surviving husband, where there were no creditors, and the heirs, though present, were not parties to the suit. In Woodward v. Thomas, 38 La. Ann. 238, it was held that where the succession, though solvent, was largely in debt, the administrator could sue for the revendication of real property without being joined by the heirs, but Mr. Justice Fenner (the organ of the court), after referring to the fact that Civ. Code, art. 1058, requires the administrator to settle all the affairs of the succession, and, after payment of the debts, to turn the property over to the heirs, said:
“This implies the right and duty to recover the property as much as to collect the debts and ascertain the surplus. It is not for him, it is true, to assail the validity of acts done by the decedent, unless necessary for the protection of creditors; and, if he have already settled all the debts and charges of the succession, it is improper for him to institute new actions, because, the objects of his agency having been fulfilled, he should give way to the heirs, who are the only persons interested and may assert their own rights.”
*189 In Succession of Delaneuville v. Duhé, 114 La. 62, 38 South. 20, it was also held that, where the succession owes debts and the heirs do not offer to pay them, the administrator may, and should, sue to recover the assets for that purpose, and the opinion of the court contains the following resume of decisions, bearing upon the functions and duties of the administrator, to wit:
“The administrator is the trustee of the creditors. His first duty is to them. He is bound to watch over their interests. Succession of Harkins, 2 La. Ann. 923; Richard v. Ouviere, 10 La. Ann. 723; Succession of Weigel, 21 La. Ann. 149. The administrator of an insolvent succession represents the creditors, and not the deceased, and may maintain for their benefit an action which the deceased were he alive could not for his own. Judson v. Connolly, 4 La. Ann. 169. The administrator has a right to collect all succession claims, which, when paid, will be assets in his hand to meet debts. Dunbar v. Thomas, 14 La. 332.”
The learned counsel for plaintiff seem, however, to think that plaintiff is entitled to administer and bring suits on the basis of the debts due by the community, and for the settlement of the community, but in that we cannot agree with them. The succession of Mrs. Delcambre, so far as the active mass is concerned, consists of her claim against the community for the paraphernal funds turned over by her to her husband, plus an undivided half interest in the residuum of the property of the community which may be left after the payment of the community debts. But what that residuum may be can be ascertained only when the debts of the community shall have been paid and the administrator of the deceased wife’s succession (the succession owing no debts) has no standing either to hasten or retard such payment, or to meddle with the property of the community. The surviving master of the community is liable for its debts — which the succession of the deceased wife is not — and he ought to be allowed, and is allowed, to make such settlement of them as may suit him and those to whom they are due, subject only to the right of the deceased wife’s creditors (if there were any — in which ease, the administrator might act in their behalf) and her heirs to interfere, in so far as may be necessary for the protection of their interests in the possible residuum which may be left of the community property after the debts of the community shall have been paid. Hewes v. Baxter, 46 La. Ann. 1281, 16 South. 196; Verifier v. Sheriff, 48 La. Ann. 717, 19 South. 677; Succession of Fernandez & de la Rosa, 50 La. Ann. 564, 23 South. 457 ; Elizardi v. Kelly, 115 La. 716 ;[1] Succession of Theurer, 38 La. Ann. 510; Succession of Fitzwilliams, 3 La. Ann. 489. Plaintiff’s counsel rely a good deal upon the rulings heretofore made by this court sustaining plaintiff’s application for appointment as administrator, and argue therefrom that the question of his right to prosecute this suit is concluded. We think not. Those rulings were predicated upon the facts that, there having been minor heirs for whom the law accepted with benefit of inventory, the original appointment of the administrator was a proper one ; that defendant applied for the appointment and acted as administrator, but failed to show sufficient authority for so doing, and could .not under the circumstances close the administration; and" that it was supposed at that time that the administrator would represent creditors of the succession in whose behalf he would be entitled to prosecute the litigation, the shadow of which was projected from his various petitions. To hold that the appointment of the administrator concluded the question of his right to prosecute or stand in judgment in this or any other particular suit would be to hold that the court undertook to decide important questions which could only arise after such suit had been instituted.
Our conclusion then is that it not appearing that the succession of Mrs. Delcambre owes any debts, and her heirs being present *191 in the state, the administrator has no standing alone to prosecute this suit. Inasmuch, however, as defendants are charged with fraud, as the charge has been pretty fully inquired into, and as there are other reasons why the suit cannot be maintained,- it will perhaps be to the interest of all parties that there should be some further expression of opinion by this court.
2. One of the definitions of the word “resolve" is “to separate the component parts of; to reduce to the constituent elements.” Webster’s Int. Die. And, under the subtitle, “Of the Resolutory Condition,” article 2045 of the Civil Code provides that:
“The dissolving condition is that which, when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed.”
When, therefore, the parties to a contract of sale have by their transactions rendered it impossible for them to place matters in the same state as though the contract had not been made, the dissolving or resolutory condition cannot be enforced. Leflore v. Carson, 7 La. Ann. 65; Pugh, Ex’r, v. Cantey, 33 La. Ann. 786 ; Heirs of Castle v. Floyd, 38 La. Ann. 583; Bryant v. Stothart, 46 La. Ann. 485, 15 South. 76 ; Ragsdale et. al v. Ragsdale et al., 105 La. 405, 29 South. 906; Bankston et al. v. Owl Bayou Cypress Co., 117 La. 1053, 42 South. 500. In the case first cited Justice Slidell, speaking for the court, said:
“How is Butler to replace the matter in statu quo? He is the mere holder of one of the notes. He is not the vendor nor anything more than a partial representative of the vendor. But McDonald, the vendor, and the vendees, have done act upon act inconsistent with a resolution of the sale. They gave the mortgages to the Union Bank which resulted in the sale to White,” etc.
And so it may be said here: How is the plaintiff, the administrator of the succession of Mrs. Delcambre, to replace matters in statu quo? That Succession was not the vendor by whom the property here in dispute was sold to Hébert, and the administrator cannot pretend to be more than a partial representative of the vendor, since Louis Delcambre, who owned one half interest, and Désiré and Laodice, who inherited one-third of the estate of their mother (the owner of the other half interest), are defendants in the suit, resisting the demand for the resolution of the sale. Moreover, Louis Dolcambre, half owner of the notes given for the purchase price of the property, and usufructuary of the other half interest, falling to the heirs of his wife, foreclosed the mortgage by which those notes were secured. The property was adjudicated to IléLert, the original vendee. I-Ie mortgaged it to Le Bron, and sold it to Louis Delcambre, subject to the mortgage, which was foreclosed by the heir of Le Bron, at whose suit it was sold by the sheriff to Désiré and Laodice Delcambre, who paid the price in cash; so that, even if it should be conceded that Louis Delcambre was not authorized to represent the community in handling the notes originally given by Hébert, the fact remains that he and Désiré and Laodice Delcambre, representing three-fourths interest in those notes, and Hébert, the vendee of the property, “have done act upon act inconsistent with a resolution of the sale,” and could not, if they would, join the administrator in his demand therefor. The theory of the plaintiff is that-all of the transactions to which we have thus referred were tainted with fraud, in which all of the parties mentioned participated, and it is argued that the court should deal with the matter as though nothing had been done to alter the situation resulting from the sale to Hébert.
There is, however, no direct testimony in support of the charges of fraud which are made against the defendants, and the facts upon which the administrator relies appear to us" to be susceptible of a more favorable construction than he places on them. Thus we find in the record of the succession of *193 Mis. Delcambre the petition of Louis Delcambre, alleging the death of his wife and the necessity for an inventory and an administration, and concluding with a prayer:
“That due notice be published * * * of his application as administrator, * * * and, further, that a commission issue to some notary public authorizing and directing him to make an inventory * ■ * * [to which is appended the order]. Let the prayer of the foregoing-petition be granted in full. Let a commission issue to L. B. Delahoussaye, directing him to make an estimative' inventory,” etc.
Thereafter an inventory was made, and Delcambre took the oath, gave bond, received letters of administration, assumed the office of administrator, and continued therein for nearly 10 years before it was discovered that there was no order appointing him. His counsel, under whose advice he acted, had no interest in placing him in such a position unless he believed that he had done so legally; and he had no interest in so placing himself, so that, whilst we are satisfied with the correctness of our former ruling (that no order of appointment was, in fact, made), we are equally satisfied that Delcambre believed, and had good reason to believe, that such an order had been made, and that he was the legally appointed and qualified administrator, and we conclude that the charge that he was actuated by a fraudulent purpose in assuming the functions of that office is unfounded.
With respect to the subsequent transaction, which he and the other defendants are alleged to have conceived and carried through for the purpose of defrauding the succession of Airs. Delcambre, and his and her children and grandchildren, we find that the law gave to Louis Delcambre as surviving partner in community the usufruct of the share of his deceased wife in the community property. He was therefore the owner of an undivided half interest in the notes which had been given by Hebert for the plantation (and some of which were pledged at the time of Mrs. Delcambre’s death for a community debt) and the usufructuary of the other half interest. Civ. Code, art. 91C. Usufruct, as we know, is of two kinds:
“Perfect usufruct, which is of things which the usufructuary can enjoy without changing their substance, though their substance may be diminished by time, or by the use to which they are applied; as a house, a piece of land, furniture and other movable effects. An imperfect, or quasi, usufruct, which is of things which would be useless to the usufructuary if he did not consume or expend them, or change the substance- of them, as money, grain, liquors.” Civ. Code, art. 534.
“Perfect usufruct does not transfer to. the usufructuary the ownership of the things subject to the usufruct. * * * ” Civ. Code, art. 535.
“Imperfect usufruct, to the contrary, transfers to the usufructuary the ownership of the things subject to the usufruct, so that he may consume, sell, or dispose of them, as he thinks proper, subject to certain charges, hereinafter prescribed.” Civ. Code. art. 536.
“If the usufruct includes things which cannot be used without being expended or consumed, or without their substance being changed, the usufructuary has the right to dispose of them at his pleasure, but under the obligation of returning the same quantity, quality and value to the owner, or their estimated price, at the expiration of the usufruct.”
Peculiar qualities are attributed by the law merchant to negotiable promissory notes in order that they may circulate as money, the main difference between the notes of the government, or of the national banks and those of individuals lying in the fact that the former are usually better secured. Occupying the position that he did, it would not only have been the right, but the duty, of Louis Delcambre to have collected the notes in question, if he could; in which event the proceeds would unquestionably have been under his absolute control, subject to the condition that he should account for the interest therein of his wife’s succession at the expiration of his usufruct. Succession ' of Dielmann, 119 La. 101, 43 South. 972. We are, however, of opinion, in view of their character, that the notes themselves were equally under his control, subject to the same condition. Fisk v. Fisk, 3 La. Ann. *195 494; Michel v. Beale, 10 La. Ann. 355; Succession of Hayes, 33 La. Ann. 1144; Michel v. Knox et al„ 34 La. Ann. 399; Heirs v. Gryder et al., 37 La. Ann. 638; Succession of Blancand, 48 La. Ann. 580, 19 South. 683. Plaintiff’s counsel contend that Deleambre was not entitled to the usufruct of his wife’s interest in the community property because he failed to record the inventory of her estate, as required by Civ. Code, art. 3350, and they refer the court to the opinion in the matter of the Succession of Landier, 51 La. Ann. 968, 25 South. 938, as supporting that contention. There is, however, no evidence in the record tending to show that the inventory was not recorded. It was made, and shows the notes in question as belonging to the community. The judgment subsequently rendered homologating the account filed by the supposed administrator, recognized him as the usufructuary of his deceased wife’s half interest therein; and Civ. Code, art. 3356, makes it the duty of the clerk of the court to have an abstract of the inventory recorded, a duty which we must presume he discharged. Moreover, by comparing the decision in Succession of Landier, supra, with those handed down in Heirs v. Gryder, 37 La. Ann. 638, and Thomas v. Blair, 111 La. 678, 35 South. 811, it will be found that the party entitled thereto does not necessarily lose the usufruct by failing to record the inventory, though, no doubt, that might be the case if it were shown that the owner was thereby prejudiced. If, then, it be true that Louis Deleambre had the right (to paraphrase the language of the law) to dispose of the notes at his pleasure, it was competent for him to pledge them to Le Bron for the debt due to the latter, whether that debt was contracted before or after the dissolution of the community, and, as they gave Le Bron a first mortgage, we can discover no reason why upon Le Bron’s threatening to sue, and with the hope of saving something by delay, there should not have been substituted for that mortgage, which was then 15 years old, a new mortgage of the same rank, and new notes, of which he could, no doubt, make better use than of the old, long past due, ones which he had been holding. The arrangement, such as it was, would not to our minds indicate any fraudulent purpose, even if it were conceded that Deleambre had no usufructuary interest in the note, for he was certainly interested in them to the extent of one-half as owner, and as a fact part of the debt for which they were pledged (and for which, probably, two of them had been pledged before the death of Mrs. Deleambre) was due by the community, so that he was at least equally interested with the heirs of his wife in keeping them and the property by which they were secured from being sacrificed. He seems to have done the best he could in that respect, and it does not appear from any evidence in the record that the succession of Mrs. Deleambre was injured thereby, or that it would now be in any better condition if L'e Bron had been allowed to foreclose his mortgage, as he originally threatened. If A. desires to sell property to B., and, for reasons which appear sufficient, chooses to pass the title through C., who is really without interest, it cannot be said (the whole transaction considered) that the conveyance to O. is either simulated or fraudulent, since it is only a means to an end, to wit, to a bona fide sale to B. This is so true that in the matter of mortgages probably the greater portion of those granted in this state are in favor of nominal mortgagees, who are wholly without interest.
Judgment affirmed.

 39 South. 851.