Dear Secretary Davis:
On behalf of the Office of State Parks (OSP), Department of Culture, Recreation Tourism (CRT), you have requested the opinion of this Office as to the legality of two agreements entered into between OSP and the Dauzat family regarding the Fort De Russy State Historic Site (the Site). These agreements reserved various rights, discussed below, to the Dauzat family when they transferred their property to the State and to its ancestor in title. In your request letter, you note that the Commissioner of Administration has never consented to either of these agreements. For the reasons more completely set forth below, and based on the facts that you have submitted with your request, it is the opinion of this Office that both of these agreements are valid. However, due to the fact intensity of your request, it is impossible for this Office to render an opinion on the ultimate outcome of our legal opinion that the agreements are valid. Thus, we further opine that the question as to the ultimate legal effects, if any, of the agreements should be settled by a court. That being said, we here undertake an extensive review of the agreements, the facts provided by you, and the law to provide you with as complete an assessment of this matter as possible, both in the interest of answering your current request, but also to advise you as to how OSP and CRT should handle such matters in the future.
In order to completely understand the significance of the agreements that are the subject of your request, it is necessary to undertake a review of the circumstances leading to the agreements. Agreement 1 was perfected in conjunction with a sale of Tracts 1 and 2 of the Dauzat family's land to the City of Marksville in 1999. In that sale, the City of Marksville paid $3,000 per acre for 53.06 acres (for an approximate price of $159,180) to the Dauzat family and agreed to donate Tracts 1 and 2, as well as Tracts 3 and 4 that the City already held, to the State for inclusion in the Fort De Russy State Historic Site. This donation was accomplished and the State took possession of Tracts 1, 2, 3, and 4 in 1999. Agreement 2 was perfected in conjunction with a sale of Tract of the Dauzat family's land to the State in 2001. The State paid $50,000 for the 1.506 *Page 2 
acre tract for the purpose of including this area within the Fort De Russy State Historic Site. The two agreements, as noted above, were completely independent contracts signed by the State and representatives of the Dauzat family around the time of each of the sales. They are not part of the sales, but rather constitute separate instruments that, as discussed more fully below, represent only a partial cause underlying the actual sales. Because it is our opinion that both of these agreements are valid, a significant question arises: What effect does this have on the State's ownership of the portions of the Site acquired from the Dauzats? To understand this question, each agreement must be, and herein is, analyzed separately.
One problem raised by the question of the validity of these agreements is the reality that State law requires a minimum size for a site to be considered as eligible to be a part of the Louisiana State Historic Site system ("System"). La. R.S.56:1684(C)(2)(a).[1] Available sources indicate that it was the acquisition of the Dauzat property by the State that brought the Site up to the necessary size to be included in the System in the first place. See Steve Mayeux, State Parks CompletesFeasibility Study: Good News and Bad News for FFD, 4 FORT DERUSSY NEWS (Nov. 1998).[2] If either of these agreements, which we believe are valid, fail for other reasons, could this result in the failure of the acquisitions of the property by the State? Not only could this cause the State to lose a portion of the Site, but the Site might also lose its status as a part of the System. As is more fully discussed below, we are of the opinion that a failure of these agreements would not result in a failure of the actual sales. However, this is tempered by the reality that further factual findings by a court could render this portion of the opinion incorrect. Although we doubt that this is a problem that will occur in this instance, the potential that such problems could exist under different circumstances in the future should be borne in mind during any future acquisitions of park land or historic sites by the State. However, in order to be sure about OSP's and CRT's rights and duties under these agreements, as we suggested in La. Atty. Gen. Op. No. 93-479, perhaps "it would seem more prudent and definitive to . . . obtain a declaratory judgment . . . from a court of law having jurisdiction over the [matter]." This course of action would seem to be the most sensible since (now paraphrasing La. Atty. Gen. Op. No. 93-479) without a court judgment delineating the effects of these agreements, OSP's and CRT's rights and duties under these instruments might remain in doubt. We further *Page 3 
counsel against the entry into such agreements in the future without a complete legal analysis of the consequences of so doing.
It is important to note that the actual acquisitions of the tracts of land that are referred to in these agreements were validly completed by the State. The Office of State Lands has confirmed that the act of donation from the City of Marksville to the State (covering the land that is discussed in Agreement 1) and the act of sale from the Dauzat family to the State (covering the land that is discussed in Agreement 2) were properly executed as to form and that they comply with the law regarding the acquisition of property by the State of Louisiana. La. R.S.39:11.
Historic Preservation and Site Importance
An important factor to note with respect to your request is that it is unquestionable that the preservation of sites of historic importance is a noble and necessary goal. Robert J. Sharer and Wendy Ashmore, ARCHAEOLOGY: DISCOVERING OUR PAST, 2d ed. 594-596 (Mayfield Publishing Co. 1993). It would, indeed, be disappointing to see the State lose control of even a portion of such an important historical site as the Fort De Russy State Historic Site.
The Fort, which played an interesting role in the Confederate defense against the Union efforts to invade the Red River Valley in 1864, is described by Joiner and Vetter thus:
 Earlier in the war, Confederate General E. Kirby Smith, commander of the Trans-Mississippi Department, had ordered that Fort De Russy be built. Over the ensuing months it had fallen into disrepair and he ordered the defenses rebuilt and expanded. Work to complete the fort began immediately [upon the Confederates learning of the Union's Red River Campaign] and by the time the Union forces arrived in mid-March, the earthen works of De Russy had been strengthened by casemates shielded by railroad iron. The bastion was armed with eight heavy siege guns and two field pieces, and manned by 200 infantry under Col. William Byrd — in addition to the gun crews. Deep rifle pits were dug between the earthen works and the river to protect the gunners, and Colonel Byrd's infantry were stationed in these protective depressions.
Gary D. Joiner and Charles E. Vetter, The Union NavalExpedition on the Red River, March 12-May 22, 1864 in Arthur W. Bergeron, Jr. (ed.), THE CIVIL WAR IN LOUISIANA, PART A: MILITARY ACTIVITY 435 (Center for Louisiana Studies 2002) (endnotes omitted). Despite these eleventh-hour refortifications of Fort De Russy, the Union ground forces under the command of Brigadier General Andrew J. Smith easily defeated the Confederate forces stationed there. Thus, *Page 4 
the fort that had once been dubbed the "Red River Gibraltar" for its anticipated impenetrability and position to defend northwestern Louisiana and Texas from the federal forces, fell virtually without a fight. Id. at 437. Although the fort fell early in the Red River Campaign, it was recaptured by a unit of Confederate cavalry before the Union was forced to retreat past it on their way back to safety from the disastrous campaign that had begun with such easy success. Id. at 453-454. Thus ended the military history of Fort De Russy.
Agreement 1[3]
Agreement 1 is a document executed between the State and the Dauzats in 1999 that contains the Dauzats' conditions for the State to use the subject land (Tracts 1 and 2) as part of the Fort De Russy Site upon donation of that land to the State from the City of Marksville. This instrument was executed prior to the sale of Tracts 1 and 2 from the Dauzats to the City of Marksville. The terms of the Agreement state that the State shall use the property as a historic site, build a perimeter fence around the tracts, landscape a portion of the property, grant the Dauzats free access to the Site, maintain a marker acknowledging the Dauzats prior ownership, avoid interfering with the Dauzat's use of other tracts, and grant the Dauzats a right of first refusal should the State decide to dispose of the property. One other clause in the agreement is interesting. This clause states that "[s]hould they choose to do so, Dauzat, their heirs, legatees, administrators and assigns, shall be allowed to cultivate and harvest hay from the subject tracts." Agreement 1 at ¶ 5.
There is no indication in the materials that you provided to this Office that the City had entered into a similar agreement with the Dauzats. Any rights or duties transferred to the State would have to come through the donation of the actual property, which had been acquired through a purchase by the City of Marksville, and not by the State directly from the Dauzats, the City's and the State's ancestors in title. Although the terms acted as reservations of rights in the Agreement when it was signed, they would become encumbrances on State land once the property was acquired by the State, perhaps implicating La. R.S.39:11, as discussed below. If the property were transferred directly to the State, the reservations in the prior Agreement would generally mean that the State acquired the tracts in something less than full ownership (i.e., less the Dauzats' reserved rights). However, because there is no correlative agreement between the Dauzats and the City of Marksville, it is clear that the City acquired the property in full ownership when it purchased it from the Dauzats. When the City donated the property to the State, it donated its entire interest in the property, which was *Page 5 
full ownership. Therefore, it is our opinion that the State acquired full ownership in Tracts 1 and 2 from the City despite the Agreement with the Dauzats that would act as a reservation of rights. Unfortunately, this does not complete the inquiry into the effects of Agreement 1.
Through the doctrine of after-acquired title, simultaneously with the State's acquisition of the Tracts 1 and 2 from the City of Marksville, the terms of Agreement 1 become active and attach to the property. The doctrine of after-acquired title is described thus:
 The after-acquired title doctrine represents the well-settled rule that `one who acquires a title or estate which he has previously conveyed is estopped to assert his after-acquired title as against the grantee or his successors.' This rule, in effect, inserts a provision in the deed that it conveys not only the title or interest possessed by the grantor at the time of its execution, but also the title or interest he might subsequently acquire.
Gregory M. Anding, Does This Piece Fit? A Look at theImportation of the Common-Law Quitclaim Deed and After-AcquiredTitle Doctrine Into Louisiana's Civil Code, 55 LA. L. REV. 159, 162 (1994). See also, Standard Oil Co. of Louisiana,200 So. 273 (La. 1941); Waterman et al. v. Tidewater Associated Oil Co.et al., 35 So.2d 225 (La. 1947). The after-acquired title doctrine applies in this situation because "when a person grants [an encumbrance] over a thing he does not own and later acquires ownership of that thing, the [encumbrance] is established by application of the `after-acquired title' doctrine." A.N. Yiannopoulos, 3 La. Civ. L. Treatise, Personal Servitudes § 14 (4th ed.) at footnote 3. See also, Bordelon v. Bordelon,499 So.2d 1050 (La.App. 3 Cir. 1986). Thus, though the State acquired the property in full ownership from the City, the simultaneous activation of the encumbrances in Agreement 1 means that the State actually acquired something less than full ownership in Tracts 1 and 2.
In your request, as to both agreements, you reference La. R.S.39:11, which states, in pertinent part, that:
 A. The commissioner of administration shall administer and supervise lands, waterbottoms, and facilities owned or leased by the state of Louisiana. The commissioner shall be an essential party to all transactions involving immovable property in which the state has an interest. No such immovable property shall be acquired, transferred, leased, or encumbered without the commissioner being a party to the transaction. *Page 6 
The question thus becomes, was there an encumbrance of State property (Tracts 1 and 2) such that La. R.S. 39:11(A) should be implicated? As to La. R.S. 39:11(A), you have informed us that the Commissioner of Administration was never a party to Agreement 1. Because the terms of Agreement 1 effectively act as an encumbrance to State property and because the Commissioner of Administration was not a party to the Agreement, the situation must be examined in further detail. If the encumbrances were entered into subsequent to the State's acquisition of the property, it is unquestionable that, under La. R.S. 39:11(A), the Commissioner of Administration would have to be a party to the agreement. Otherwise, the agreement would be invalid ab initio
for failure to comply with the necessary mandates of La. R.S.39:11.
However, the Agreement was entered into prior to the acquisition of the property by the State. It is the opinion of this Office that the public records doctrine would hold that the State was on notice of Agreement 1, even though it was executed by OSP rather than the Division of Administration, prior to accepting the donation of the property from the City of Marksville. La. R.S. 9:2721 and La. R.S. 9:2754. Thus, because of this presumed constructive knowledge, the State actually accepted the donation subject to the reservation of rights that were filed in the public records. See generally, Warren L. Mengis, ThePublic Records Doctrine Revisited, THIRTY-SEVENTH ANNUAL INSTITUTE ON MINERAL LAW (March 29, 1990); McDuffie v. Walker,51 So. 108 (La. 1909). Because the Agreement predated the donation and because the State was on notice of the terms of the agreement, via the public records doctrine, it is our opinion that State land was not encumbered in this instance. The State simply acquired the property in less than full ownership, thus never implicating La. R.S. 39:11. Therefore, it is our opinion that Agreement 1 was valid when entered into and valid when the property was acquired by the State. We will address the matter of continued validity later.
Agreement 2[4]
Agreement 2 is a document executed between the State and the Dauzats in 2001 that contains the Dauzats' conditions for the State to use the subject land (Tract 7) as part of the Fort De Russy State Historic Site upon the sale of that land to the State. Unlike the contents of Agreement 1, Agreement 2 contains conditions for the sale of property directly to the State. Most of these conditions also constitute encumbrances of the property that the State is to acquire through the sale. The terms of Agreement 2 include: a right of first refusal to the Dauzats in the event that the State ever decides to dispose of the property, two utility easements on the property, a usufruct for Lee J. Dauzat and his heirs and *Page 7 
assigns to leave the land vacant or to raise agricultural products until the property becomes an active state park, and a right for Lee J. Dauzat to harvest pecans from several State tracts until the property becomes an active state park.
You have informed us that the Commissioner of Administration was not a party to this transaction. As with Agreement 1, Agreement 2 was entered into by the State prior to the sale of Tract 7. Once again, following the discussions of the after acquired title doctrine and the public records doctrine discussed above, it is our opinion that Agreement 2 was valid at the time that it was signed and was also valid when the State acquired Tract 7. Such an opinion, an discussed above, leads to the necessary conclusion that, because the encumbrances essentially came with the land when the State acquired it and not subsequent thereto, La. R.S. 39:11 is inapplicable and the Commissioner of Administration was not a necessary party to Agreement 2. Thus, the State acquired Tract 7 in less than full ownership.
What Happens to the Property?
The validity or invalidity of the above-referenced agreements does not automatically affect the acquisitions of the property by the State. The reason for this is that these agreements are not the acts of donation or sale; they are separate agreements between the State and the Dauzat family. As long as the causes of the donation and sale are not affected by the viability of these separate agreements, then those acts should be able to survive on their own. Also irrespective of the validity of the above-referenced agreements, the donation and sale, because they are acquisitions of property by the State, must conform with the requirements of La. R.S. 39:11. As you have informed us, the Commissioner of Administration was a party to the actual donation and sale of the Fort De Russy property at issue, thus satisfying La. R.S. 39:11. Therefore, standing alone, without a consideration of the subject agreements, it is our opinion that the State has properly acquired the subject property at the Site. Unfortunately, this fact does not complete the inquiry into the viability of the sales to the City of Marksville and to the State.
One matter that might affect the viability of Agreement 1 is the extensive documentation that you have presented demonstrating the Dauzats' alleged failure to uphold their obligations under the Agreement with respect to the harvesting of hay. Though the factual question of their adherence to the Agreement is one for a court to decide, we can examine the legal ramifications of a breach of contract on the ultimate disposition of the property. The same does not seem to hold true for Agreement 2 under the information that you have submitted to this Office, as there does not seem to be any breach by the Dauzats. As for the hay harvesting, according to the materials that you submitted with your request, the Dauzats have not harvested the hay on the subject property with the regularity necessary to make the Site usable as a state *Page 8 
park. Ultimately, OSP has had to contract with third parties to have this harvesting accomplished, despite numerous entreaties to the Dauzats to complete the harvesting. If the failure to act by the Dauzats is found to be a breach of the Agreement, then the Agreement, in its entirety, will fail. The reason for this is that there is no severability clause in the Agreement that would allow the invalid or breached provisions to be eliminated without affecting the remaining provisions. Thus, if one portion of the Agreement is rendered invalid or is breached, the entire Agreement fails. See Taylor v. Taylor, 772 So.2d 891, 895-896
(La.App. 2 Cir. 2000).
How would such a finding of breach affect the State's interests in the subject property? Both of the agreements entered into between the State and the Dauzat family relate to the sales of the various tracts. Sales are nominate contracts under Louisiana law. La. C.C. Art. 1914. In general, all contracts under Louisiana law fall under the broader category known as obligations. La. C.C. Art. 1906. Thus, as with all types of obligations, sales must be supported by a legal cause. La. C.C. Art. 1966. The cause of an obligation is "the reason why a party obligates himself." La. C.C. Art. 1967. "A cause may exist at the inception of an obligation and then fail. When such is the cause the obligation ceases to exist when its cause fails." Saúl Litvinoff, Still Another Look at Cause, 48 LA. L. REV. 3, 7 (1987). It appears from the language of the agreements that the State's entry into the agreements with the Dauzat family constituted a component of the cause for the sales that the Dauzat family entered into with the City of Marksville and the State. Other components of the cause of these agreements may include the monies paid to the Dauzats for the acquisition of the property and the Dauzats' interest in a philanthropic association with the Site (as evidenced by the demand for a plaque commemorating their prior ownership). Because we have opined that, due to the absence of a severability clause the agreements will fail for the failure of one part, it must be considered what would happen to the underlying sales in the event of a failure of the agreements. If the agreements cause the sales to fail, the parties must be returned to their original, precontract positions. La. C.C. Art. 2033.
What is the effect of the partial failure of cause on the sales to the City of Marksville and the State? It is our opinion that, despite this partial failure of cause, the obligations do not fail altogether. Louisiana courts have consistently held that a partial failure of consideration[5] is not grounds for a complete failure of *Page 9 
a contract (or sale). See e.g., Jackson v. Slidell Nissan,693 So.2d 1257 (La.App. 1 Cir. 1997); Fraering v. State Nat. Bank,542 So.2d 820 (La.App. 3 Cir. 1989). As consideration, a common law concept, is generally equated with the civil law concept of cause, it is our opinion that a partial failure of cause similarly does not represent grounds for a complete failure of a contract. Each situation will, of course, be fact-specific in this regard. However, because the Dauzat family was paid for the subject property, we believe that the failure of the encumbrance agreements with the family does not constitute a substantial enough defect to cause the otherwise valid sales to fail. The materials that you have submitted to this Office support this conclusion by showing that the Dauzats really did not exercise the rights that they had under these agreements anyway.
Indeed, with respect to other sales, the courts generally follow the maxim that, "[i]f defects exist which merely diminish the value or utility of the [thing], constituting a partial failure of consideration, a reduction in the purchase price, rather than a recission of the sale, is the appropriate remedy."Fly v. Allstar Ford Lincoln Mercury, Inc., 690 So.2d 759, 761
(La.App. 1 Cir. 1996). In the situation outlined in your request, the defect as to the Dauzat family is their failure to exercise encumbrances over property that they were compensated for (in the approximate amount of $209,180). Thus the failure of the encumbrances is only, at most, a diminished utility for which no recission would be due or warranted. Additionally, because they were paid for the property (presumably at fair market value), it cannot be said that the Dauzats would be due an increase in the sale price for losing rights that they did not exercise with any seriousness or regularity.
Though under the facts as discussed herein we doubt that this eventuality would come to pass, we feel it necessary to caution that a suit for a recision of Agreement 1 may result in a complete failure of the original sale and, an argument could be made that, pursuant to La. C.C. Art. 2033, all parties would be returned to their original, precontract positions. It is our opinion that a recision of the underlying Agreement would simply mean that the encumbrances on the land would fail, leaving the State with the property and the Dauzats with the purchase price. However, it cannot be ruled out that a court might interpret the recision of the Agreement as a complete failure of cause, thus defeating the property transfers supported by that cause (though we do not think that the Agreement rises to the level of the total cause of the sale). Because of that possibility, we suggest that you consider the alternative approach to remedying this matter through a lesser challenge than recision, namely seeking damages for breach of contract and any delay damages that may be available. If the Dauzats are determined to have breached the Agreement, the State could, in the interest of caution, allow the Agreement to stand and simply demand damages for the breach. Additionally, if the potential breach has caused the State any delays or inconveniences with respect to the use or preparation of the property for its *Page 10 
intended use as a state park, the State should also consider seeking delay damages.
If a breach is found, any donation of such rights to the family from the State at this point would clearly violate the prohibition against donations of State property in La. Const. Art. VII, Sec. 14. See La. Atty. Gen. Op. No. 91-104. The Louisiana Constitution states that ". . . the funds, credit,property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private." La. Const. Art. VII, Sec. 14(A) (emphasis added). Although this is the general rule as to donations of property by the state or its political subdivisions, there are exceptions and deviations from the general rule. However, under the detailed analysis of these exceptions in La. Atty. Gen. Op. No. 05-0172, it is clear that there is no way to make such a donation to the Dauzat family validly under current Louisiana law.
A Natural Obligation?
The effects that would flow should a court decide that the donation of Tracts 1 and 2 and the sale of Tract 7 did not occur simultaneously with the terms of the agreements becoming enforceable, are now considered. If a court decides that the sale and donation occurred before the agreements' terms would apply, then it is our opinion that La. R.S. 39:11 would apply, as the agreements would then represent encumbrances of State property, requiring the Commissioner of Administration to be a party. Because the Commissioner of Administration was not a party to either of these agreements, it would be our opinion that the agreements are invalid. However, to the extent that the State has allowed the Dauzats, in the ensuing years, to act upon some of the provisions of the agreements, it would be our opinion that a natural obligation (the acquiescence to the terms of the agreements that were otherwise invalid) has been converted to a conventional obligation, thus making the portions of the agreements acted upon valid. La. C.C. Art. 1761. If this is the case, the preceding discussion of breach and unconstitutional donation of State property should be considered in determining whether these portions of the agreements can continue to be honored. Again, this becomes a fact-specific matter on which we cannot render any further opinion.
The Whim of the Obligor
In the interest of completeness, we feel it necessary to examine the vague nature of the provision related to hay harvesting in Agreement 1. It could be said that paragraph 5 of Agreement 1, stating that the harvesting of hay will occur when the Dauzats "[s]hould choose to do so," appears to be a provision resting on the whim of the obligor (known in previous versions of the Civil Code as a "purely potestative condition"). See, Saúl Litvinoff, THE LAW OF OBLIGATIONS IN THE *Page 11 
LOUISIANA JURISPRUDENCE 526 (5th ed., Center of Civil Law Studies 2000). There is language in the Louisiana Civil Code that states that when an obligation is dependant on the whim of the obligor, the obligation itself is null. La. C.C. Art. 1767. However, it is our opinion that this provision does not fall under the control of this portion of the Civil Code and thus the whim evident in the "[s]hould choose to do so" does not cause Agreement 1 to fail. The primary reason for this is that the provision in paragraph 5 is not a suspensive condition, the only type of provision to which this nullity applies. Id. See also, Saúl Litvinoff, 5 La. Civ. L. Treatise, Law of Obligations § 5.6 (West 2d ed.). The language in paragraph 5 is merely a term of the Agreement and not a condition on which the completion of the Agreement or the subsequent sale rests, thus avoiding classification as a suspensive condition and the application of the nullity provided for in La. C.C. Art. 1767. Accordingly, it is our opinion that Agreement 1 cannot be invalidated on the grounds that the exercise of one provision seems to rest of the whim of the obligor.
We feel it necessary to point out that, in addition to the vague nature of the terms of paragraph 5 of Agreement 1, the terms also appear to be nonexclusive. Thus, if these terms are found to be nonexclusive, meaning that they do not reserve the right to harvest hay to the Dauzats and only the Dauzats, it is our opinion that the State is free to contract with third parties to have the harvesting completed in the interest of preserving the utility of the subject property as a state park. To the extent that the State's granting of a harvesting contract to a third party might interfere with the Dauzats' right to harvest the hay "[s]hould they choose to do so," this Office has no opinion save the thought that the whimsical nature of the Dauzats' right seems to undermine the State's use of the property as a state park. Additionally, common sense suggests that the Dauzats' failure to exercise their right, if not an outright breach, would have to become subservient to a third party contract that actually facilitates the use of the property for the State's purposes. It is doubtful that the State would have agreed to the terms of Agreement 1 if it knew that it could not always use the property for its intended purpose due to the lack of desire for the Dauzats to exercise their harvesting right. Additionally, such a contract with third parties would not constitute a breach of the Agreement by the State, as the language in Agreement 1 did not rule out the possibility that another party could harvest the hay if the Dauzats opted not to exercise that right.
Additional Materials and Agreement Terms
As part of your opinion request, you provided this Office with a large number of documents that retells the history of the relationship between the State and the Dauzat family with respect to the Site. Much of this material is very fact intensive and really cannot be used to assist in our rendering of a legal opinion. These materials are more suited to a factual dispute in a court of law over the question of breach of the Agreements, thus we do not address them further herein. *Page 12 
 Summary
 1) It is the opinion of this Office that both of the agreements granting the Dauzat family certain encumbrances over the property now known as the Fort De Russy State Historic Site are valid because, through the public records doctrine and the after-acquired title doctrine, they attached to the property simultaneously with the State's acquisition of it, thus never invoking the requirements of La. R.S. 39:11 that the Commissioner of Administration must be a party to the agreements.
 2) We opine that if there is found to be a failure of the agreements that are the subject of your request, the underlying acquisitions of the property by the State do not also fail.
 3) It is also our opinion that, regardless of the ultimate outcome of the subject agreements, the State has validly acquired the property. Such acquisition is likely not an acquisition in full ownership, though.
 4) The State can likely contract with third parties for the harvesting of hay due to the fact that the use of the subject property is dependant on such harvesting and the Dauzats' Agreement is nonexclusive as to their right to harvest the hay.
 5) In the event that any new contracts are negotiated with the Dauzat family, the State must comply with all general sales laws, as well as the provisions of La. R.S. 39:11. This means that the Commissioner of Administration must be a party to any contract that acquires, sells, donates, or encumbers any State property.
 6) To ensure compliance with State law and to act in the best interests of the State, we recommend that any future agreements be examined carefully in order to assess their effects on the State's interests and to ensure that the State in not endangering its protection of important historic sites.
 7) OSP and CRT might want to consider seeking a declaratory judgement on their rights and duties under the subject agreements as this Office is not able to render an opinion on the factual aspects of the agreements. Such an action would clear up any ambiguity as to OSP's and CRT's rights and duties under the agreements.
 8) If Agreement 1 is ultimately declared invalid, we suggest that OSP and CRT seek a lesser remedy than recision of the Agreement. Such a remedy could include damages for breach and delay. *Page 13 
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
Sincerely yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
By: __________________________ RYAN M. SEIDEMAN Assistant Attorney General *Page 14 
 ATTACHMENT
 State of Louisiana
 DEPARTMENT OF JUSTICE P.O. Box 94005
WILLIAM J. GUSTE, JR. Baton Ronge Baton Rouge, LA
ATTORNEY GENERAL 70804 70804-9005
 (504)-342-7013
 MARCH 13 1991
 OPINION NUMBER 91-104
 OPINION NUMBER 91-104
 90-A-2 — PUBLIC FUNDS — Loan, Pledge or
Mr. James E. Scriber Grants
Superintendent La. Const. Art. VII, § 14 (1974)
Claiborne Parish Schools School board cannot donate its property
P.O. Box 400 to another legal body without a legal
Homer, Louisiana 71040-0600 obligation or duty to do so.

Dear Mr. Scriber:
You have propounded the following question to the Attorney General and requested an opinion which would address the question:
 "May a school board donate property it owns, but no longer has any use for, to another public body?"
As the question is posed, the answer is negative. The transfer of public property between distinct political subdivisions of the State is a cooperative endeavor governed by La. Const. Art. VII, § 14C (1974). The Louisiana Supreme Court has held that such § 14C cooperative endeavors are subject to the prohibition against donations of public property of La. Const. Art. VII, § 14A (1974). The threshold standard for determining whether such a transfer is not an unconstitutional donation is to determine whether the owner of the public property has any legal obligation to transfer it to the other public entity. City of Port Allen v.La. Risk Management, Inc., 439 So.2d 399 (La. 1983); Town ofBrusly v. West Baton Rouge Police Jury, 283 So.2d 288 (La.App. 1st Cir. 1973).
Because your question does not identify any legal obligation by the school board to transfer this property to another political subdivision or public body, the transfer is prima facie
unconstitutional under La. Const. Art. VII, § 14 (1974). *Page 15 
To facilitate a better understanding of Art. VII, § 14 (1974), in Opinion No. 90-651 the Attorney General undertook a comprehensive review of the genesis and jurisprudential development of this constitutional principle. A copy of Opinion No. 90-651 is attached for your information.
Trusting this to be of sufficient information, I am,
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY:_________________________ CHARLES J. YEAGER Assistant Attorney General
[1] This statutory provision requires that
 [a] state historic site will be of sufficient size to encompass the area or feature being commemorated or to adequately commemorate the event, feature, or culture for which the area is established, or both. Sufficient buffer will be established to minimize any encroachments which may impair the historical values and inhibit public use and appreciation of the area.
La. R.S. 56:1684(C)(2)(a).
[2] A copy of this article may be viewed online athttp://www.fortderussy.org/Bugle4.htm, last accessed February 10, 2006.
[3] Agreement By and Between the State of Louisiana, Lee J. Dauzat, Evelyn D. Reynaud, Shirley Dauzat, Jimmy L. Dauzat and Julie D. Dauzat. Signed by Philip Jones, Secretary, CRT, July 12, 1999, and Dauzat family representatives, July 23, 1999. Copies on file with Office of State Parks, CRT; Office of State Lands, Division of Administration (DOA); and the Lands Natural Resources Section, Louisiana Department of Justice (DOJ).
[4] Agreement By and Between the State of Louisiana, Lee J. Dauzat, Evelyn D. Reynaud, Shirley Dauzat and Jimmy L. Dauzat. Signed by Dwight Landreneau, Assistant Secretary, Office of State Parks, CRT, May 14, 2001, and Dauzat family representatives, May 30, 2001. Copies on file with Office of State Parks, CRT; Office of State Lands, DOA; and Lands Natural Resources Section, DOJ.
[5] The case law uses the term "consideration" rather than "cause." "Consideration" is a common law term that is largely the equivalent of the civil law term "cause." See generally, N. Stephan Kinsella, A Civil Law to Common Law Dictionary, 54 LA. L. REV. 1265 (1994). Although we use "consideration" here when discussing the case law, this is only to accommodate the original language of the jurisprudence. It is our intention that the concepts related to "consideration" in the cases should more appropriately be discussed in civil law terms, thus the remainder of the discussion uses "cause," though for the purposes of this opinion, the two terms have the same meaning.