563 So.2d 355 (1990)
George PARKER, et al., Plaintiffs-Appellees,
v.
DUBUS ENGINE COMPANY, et al., Defendants-Appellants.
No. 88-1379.
Court of Appeal of Louisiana, Third Circuit.
May 23, 1990.
Kermit A. Doucet, Lafayette, for plaintiffs/appellees.
*356 Landry Rogers & Landry, Michael F. Rogers, Crowley, for defendants/appellants.
Martin, Taulbee, Rowe, Bares & Oliver, Terry L. Rowe and Preston Cloyd, Lafayette, for Commercial Union Ins. Co.
Before DOMENGEAUX, C.J., and FORET and STOKER, JJ.
STOKER, Judge.
This is a redhibitory action filed by plaintiff, George Parker, against Dubus Engine Company (Dubus), Commercial Union Insurance Company (Dubus's liability insurer), and Rodco Worldwide, Inc. (Parker's insurer)[1] for fire damages sustained from three fires that damaged two 671 Detroit diesel engines which were rebuilt and sold to Parker by Dubus. Parker subsequently reached a settlement with Rodco Worldwide, Inc. and it was dismissed from this suit prior to trial. Commercial Union also joined in this suit as a plaintiff under its subrogation rights as Parker's insurer during the first fire, seeking reimbursement from Dubus for sums paid to Parker under his insurance policy following the first fire. Dubus filed a reconventional demand against Parker for the cost of repairs to his engines and for rental of an engine. Dubus also filed an exception of prescription against Parker and Commercial Union alleging that their actions for damages sustained from the first fire on May 25, 1985 had prescribed under one year liberative prescription. Finally, Commercial Union filed an amended answer alleging no coverage under the liability policy issued to Dubus Engine Company.
The trial court overruled Dubus's exception of prescription and held in favor of Parker against Dubus, awarding $14,812.13 damages plus costs and attorney's fees. The trial court also held in favor of Commercial Union as a party-plaintiff on its demand against Dubus, awarding $7,871.56. The trial court dismissed Dubus's reconventional demand against Parker for the cost of repairs and rental. Finally, the trial court held there was no coverage in this matter under the liability insurance policy issued by Commercial Union to Dubus.
Dubus Engine Company appeals this judgment contending the trial court erred in overruling its exception of prescription, in finding the engines and their attachments to be defective, in the calculation of damages sustained by Parker, in dismissing its reconventional demand against Parker and in denying coverage for Parker's damages under the liability insurance policy issued by Commercial Union to Dubus. The issue as to the trial court's denial of Dubus's reconventional demand against Parker has not been briefed and is therefore deemed abandoned.

FACTS
Plaintiff, George Parker, required an engine to drive the water well on his farm. Deciding that the cost of overhauling his previously used Waukesha natural gas engine was prohibitive, Parker decided to purchase a rebuilt 671 Detroit diesel engine from Dubus Engine Company. The diesel engine was installed in July 1984 by Larry Cain, the service manager for Dubus and owner of Dubus in Crowley, Louisiana. On May 25, 1985 the engine caught on fire while in operation and was totally destroyed. Parker was away on vacation at the time and the fire was discovered by Melvin Griffin, an employee of Parker. Keith Fontenot, Parker's tenant farmer, saw to the destroyed engine's replacement with another rebuilt 671 Detroit diesel engine by Dubus. The cause of the fire was not investigated by Parker, his employees or Dubus. Larry Cain theorized that a grass fire caused by carbon emission from the exhaust was the source of the fire. However, there was no evidence that this was, in fact, the cause of the fire. Parker's insurer, Commercial Union, paid Parker's claim of $7,871.56 on the engine and *357 canceled Parker's insurance. Parker was allegedly unable to obtain insurance immediately thereafter.
Parker purchased the second rebuilt 671 Detroit diesel engine from Dubus for $8,391.11. On May 5, 1986 Larry Cain visited Parker's farm to replace the tachometer on the second engine and reset the engine speed. Shortly after Cain left, the engine caught on fire. Griffin saw the smoke and cut off the fuel. The engine registered .8 hours on its new tachometer. Cain installed a temporary engine and repaired the second engine at his shop. Again, Cain assumed a grass fire had caused the engine damage. Cain stated that the engine had seemed to be in good repair and running well. However, Parker requested an investigation by the State Fire Marshal's office. The Fire Marshal, accepted by the court as an expert in arson investigation, testified that there was no evidence of vandalism or arson, the fire did not originate from a grass fire and the source of the fire was the area of the fuel lines. The Fire Marshal stated that the only logical explanation for the fire was that a rubber fuel line separated from a copper fuel line at the fitting, causing diesel to flow out, vaporize and ignite from the heat of the engine. Parker did not have insurance coverage for the second fire.
The temporary replacement engine hooked up by Cain after the second fire suffered a ruptured rubber fuel return hose or a fuel leak in a hose shortly after its installation. Diesel fuel spewed from the hose onto the engine. Griffin saw the fuel spewing out just as it occurred and cut the fuel off. Parker replaced the hose with a high pressure hydraulic line he purchased himself and the temporary engine continued to operate until it was replaced with the repaired second engine. The repairs to the second engine amounted to $1,961.27.
The second engine caught on fire again on May 20, 1986 and was totally destroyed. The Fire Marshal again investigated and reached the same conclusions as he had following the second fire. The Fire Marshal stated that in his expert opinion the fire was caused by prior engine damage combined with a related mechanical failure of the engine, probably a ruptured fuel hose. The area of the fuel hoses was definitely the source of the fire.
Cain removed the second engine following the fire of May 20, 1986 and installed another temporary engine. Two days later Parker told him not to attempt to repair the engine yet because the insurance adjuster wanted to look at it. However, Cain had already torn the engine down since it was totally destroyed. Cain stated that he had no idea what caused the third fire and acknowledged that it could not have started with a grass fire since all the surrounding vegetation had been killed by the May 5, 1986 fire.
Parker had purchased insurance from Rodco Worldwide, Inc. which was in effect at the time of the May 20, 1986 fire. However, Rodco subsequently canceled Parker's insurance retroactively to the date it went into effect for Parker's alleged failure to inform it of his prior fires.
Parker refused to purchase another 671 Detroit diesel engine from Dubus and instead bought a Minneapolis Moline engine elsewhere. Parker asserts that he has had no problems with his new engine. Dubus then made a formal demand on Parker for payment of the $1,961.27 cost of repairs to the second engine following the second fire and for $600 rental of the last temporary engine. Dubus explained that Parker was charged rental because he did not purchase a new engine from them. Parker then instituted this suit for damages.
At trial, Quinton Doucet, an expert in diesel engine repair and diagnostic troubleshooting, testified that Cain had improperly installed both 671 Detroit diesel engines with copper fuel lines, with the wrong size of fuel lines (too small) and with the wrong type of fittings, which resulted in separation of the fuel lines at the fittings. When the fuel lines separated, diesel spewed and ignited from the exhaust. Parker introduced the Detroit Diesel Engines Field Service Data Manual into evidence to prove the types and sizes of fuel lines and fittings *358 which the manufacturer intended to be used on the engines.

OPINION

EXISTENCE OF DEFECTS
Dubus contends on appeal that the trial court erred in finding that the engine and its attachments were defective.
In order to establish a prima facie case in redhibition, a buyer must show that a non-apparent defect existed at the time of sale. LSA-C.C. art. 2520 and art. 2530. The evidentiary burden is that the proof must be more probable than not. He need not prove the underlying cause of the defect, but only that it existed. Ezell v. General Motors Corp., 446 So.2d 954 (La. App. 3d Cir.), writ denied, 449 So.2d 1350 (La.1984), and cases cited therein. It is settled that where complicated machinery is involved it is not necessary for the buyer to seek out and prove the underlying defect which makes the object sold unfit for its intended use. It is sufficient that he allege and prove such a defect. J.B. Beaird & Co. v. Burris Bros. Ltd., 216 La. 655, 44 So.2d 693 (1949); Domingue v. Whirlpool Corp., 303 So.2d 813 (La.App. 3d Cir.1974). These are questions of fact, and the trial court's conclusions about them should not be set aside absent manifest error. Rasmussen v. Cashio Concrete Corp., 484 So.2d 777 (La.App. 1st Cir.1986). Once the plaintiff establishes his prima facie case, the burden shifts to the defendant to show that he can somehow escape liability. Ezell v. General Motors Corp., supra.
After careful review of the record, we find no manifest error in the trial court's determination that both engines had redhibitory defects. The two engines were both so unsatisfactory and imperfect that it must be supposed that Parker would not have purchased them had he known of their vices. Although Parker was not able to show precisely which underlying defects caused the two engines to burn up due to the extensive damages to the engines following each fire, he did establish through expert testimony that the area of the fuel lines was the originating point of the second and third fires and that neither of the engines was properly installed by Dubus with the correct types and sizes of fuel lines. Although Dubus contended that grass fires or vandalism caused the engines to burn, no evidence of this was adduced at trial and the expert testimony of the State Fire Marshal as to the causes of the last two fires flatly negates these possibilities. Finally, the spewing of fuel over the engine from a rupture or leak in the temporary replacement engine supports these conclusions. Parker clearly established a prima facie case of redhibitory defects which Dubus has failed to refute.
Therefore, the trial court's finding that the engines had redhibitory defects is affirmed.

PRESCRIPTION
Dubus also contends on appeal that the trial court erred in overruling its exception of prescription. On the issue of prescription, the trial court reasoned that Dubus must be held to the standard of a manufacturer since it rebuilt the engines in question and installed the engines and the fuel lines connecting the engines to the fuel tank. Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803 (La.1974); Rasmussen v. Cashio Concrete Corp., 484 So.2d 777 (La.App. 1st Cir.1986); Red Arrow Sales, Inc. v. Dixie Motors, Inc., 442 So.2d 570 (La.App. 1st Cir.1983). As a manufacturer, Dubus is presumed to have known of the vices in the engines and is liable for damages caused by the defective engines. Rasmussen v. Cashio Corp., supra; Red Arrow Sales, Inc. v. Dixie Motors, Inc., supra. The prescriptive period for an action against a seller in bad faith is one year from the discovery of the vice. Discovery of the defect is not presumed; it must be proven by the seller. LSA-C.C. art. 2546.
Dubus contends that since the first engine was destroyed by fire on May 25, 1985 and plaintiffs' suit was not filed until September 9, 1986, plaintiffs' cause of action has prescribed. In Jordan v. Employee Transfer Corp., 509 So.2d 420 (La. 1987), the Supreme Court discussed at length the *359 kind of notice to a plaintiff of a defect which will start the running of prescription. The court concluded as follows:
"Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
"When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction. The Jordans knew there was damage on October 1, 1982, when they discovered the water in their den. However, prescription did not begin to run until they had a reasonable basis to pursue a claim against a specific defendant. This did not occur until December 1, 1982, when the plaintiffs had a reasonable basis to conclude that Key's assurances and the Madden report were incorrect. Since the Jordans filed suit on December 1, 1983, prescription had not yet run." 509 So.2d at 423.
Parker testified that Cain suggested that the cause of the fire may have been arson. Cain testified that he believed that carbon emissions from the exhaust may have started the fire in the surrounding grass. However, the engine was totally destroyed in the first fire and the exact cause of that fire was never investigated further or determined.
We cannot conclude that the first fire put Parker on the kind of notice which will start prescription running. We find that prescription did not begin to run until the second fire on May 5, 1986, the occurrence and investigation of which provided Parker with a reasonable basis to pursue a claim against Dubus. Therefore, the trial court did not manifestly err in dismissing Dubus's exception of prescription.

DAMAGES
Next, Dubus argues on appeal that the trial court erred in awarding damages to Parker which are not supported by competent evidence. Dubus complains, specifically, of the damages awarded for the replacement of a shed, loss of timbers, loss of diesel fuel, clean-up costs, phone calls, cost of replacement of the fuel return line which ruptured or leaked on the temporary engine and damages to Parker's water well. The only evidence introduced at trial of these damages was Parker's own uncorroborated estimates.
It is settled that it is the plaintiff's burden to prove with legal certainty every item of damages claimed. This burden must be borne by competent evidence showing the extent of the damage and plaintiff's own uncorroborated personal estimate of the value of the loss is insufficient. Smith v. White, 411 So.2d 731 (La. App. 3d Cir.), writ denied, 413 So.2d 508 (La.1982); Freeman v. G.T.S. Corporation, 363 So.2d 1247 (La.App. 4th Cir.1978).
We conclude that the above cited, uncorroborated damages awarded by the trial court must be reversed for plaintiff's failure to introduce sufficient and competent evidence upon which to base an award. Plaintiff has proven, by invoices, bills and repair orders, damages in the amount of $10,352.38 for repair of the second engine after the second fire ($1,961.27) and the original sale price of the second engine which was totally destroyed in the third fire ($8,391.11).

COMMERCIAL UNION'S LIABILITY TO DUBUS
Finally, Dubus contends the trial court erred in holding that the policy exclusions relied on by Commercial Union are applicable to Dubus's claim. The exclusions are contained in the liability policy issued by Commercial Union to Dubus as follows:

"C. WE WILL NOT COVEREXCLUSIONS.
"This insurance does not apply to:
* * * * * *
"11. Property damage to any of your products or any part of your products if caused by a defect existing at the *360 time it was sold or transferred to another.
"12. Property damage to work you performed if the property damage results from any part of the work itself or from the parts, materials or equipment used in connection with the work."
Dubus argues that the only work it performed was installation of the engine and design and construction of the fuel system. However, this contention is refuted by the fact that Dubus also rebuilt each of the engines in question before selling them to Parker. As a "manufacturer," the engines are clearly Dubus's "product." Moreover, the installation of the engines and fuel systems was "work performed" by Dubus.
Our jurisprudence is settled to the effect that liability policies containing exclusions similar to those reproduced above provide no coverage to the insured for repair or replacement of his own defective work or defective product. Liability policies are not performance bonds. Kold, Inc. v. United States Fidelity & Guar. Co., 496 So.2d 1338 (La.App. 3d Cir.), writ denied, 498 So.2d 758 (La.1986); Aetna Ins. Co. v. Grady White Boats, Inc., 432 So.2d 1082 (La. App. 3d Cir.1983); Breaux v. St. Paul Fire & Marine Ins. Co., 345 So.2d 204 (La.App. 3d Cir.1977); Vobill Homes, Inc. v. Hartford Acc. & Indem. Co., 179 So.2d 496 (La.App. 3d Cir.1965), writ denied, 248 La. 698, 181 So.2d 398 (1966). However, coverage for damages to other property or for other accidental loss resulting from the defective condition of the work-product have been allowed, even though recovery for the injury to the work-product itself and consequential damages are excluded. Allen v. Lawton & Moore Builders, Inc., 535 So.2d 779 (La.App. 2d Cir.1988); Breaux v. St. Paul Fire & Marine Ins. Co., supra; Vobill Homes, Inc. v. Hartford Acc. & Indem. Co., supra.
As discussed above, Parker has failed to prove any damages other than to the Dubus engines and their attachments. Therefore, the items of damages awarded herein fall within the policy exclusions. The trial court did not err in holding that the policy exclusions relied on by Commercial Union apply to the facts of this case.

CONCLUSION
For the reasons given, the judgment of the trial court is affirmed and amended to reduce the award of damages to George Parker to $10,352.38. Costs of this appeal are assessed to defendant-appellant, Dubus Engine Company.
AMENDED, AFFIRMED AS AMENDED; RENDERED.
NOTES
[1] Three fires are involved in this case. Commercial Union was Dubus's liability insurer throughout. Commercial Union also insured Parker's first engine during the first fire but did not insure Parker thereafter. Rodco Worldwide, Inc. insured Parker's second engine during the third fire. Parker did not have insurance during the second fire.