690 So.2d 759 (1996)
Richard J. FLY
v.
ALLSTAR FORD LINCOLN MERCURY, INC., Ford Motor Corporation, and Premier Bank, National Association.
No. 95 CA 1216.
Court of Appeal of Louisiana, First Circuit.
August 21, 1996.
*760 Thomas J. Bergman, Baton Rouge, for Plaintiff-Appellee Richard J. Fly.
Robert W. Maxwell, J. Jeffery Raborn, Pulaski, Gieger & Laborde, New Orleans, for Defendants-Appellants Allstar Ford Lincoln Mercury, Inc., and Ford Motor Corporation.
Before SHORTESS, PARRO and KUHN, JJ.
PARRO, Judge.
This appeal stems from an action in redhibition filed by plaintiff, Richard J. Fly ("Fly"). Defendants, Allstar Ford Lincoln Mercury, Inc. ("Allstar") and Ford Motor Company ("Ford"), appeal a judgment rendered in accordance with a jury verdict which awarded Fly a reduction in purchase price, expenses, and attorney fees. We amend in part and, as amended, affirm.

FACTS AND PROCEDURAL HISTORY
On July 2, 1992, Fly purchased a Ford Ranger truck from Allstar for $16,222.75. Shortly after the purchase, Fly noticed the engine warning light would occasionally come on and he became concerned. He returned the vehicle to Allstar on several occasions over the next few weeks, but the problem was not corrected. Although he never experienced mechanical failure with the truck, Fly returned it to Allstar less than two months after its purchase and left it there.
Fly ceased payments on his note to Premier Bank ("Premier"), through which he had financed the truck, and Premier eventually had the vehicle seized by the sheriff. Fly instituted a redhibition suit against Allstar, Ford and Premier. Premier purchased the truck at the sheriff's sale and eventually *761 repaired and sold it, then reconvened against Fly for a deficiency judgment.
Ford filed a motion in limine to restrict Fly's action to one for a reduction in price since the vehicle was no longer in Fly's possession and therefore could not be returned to the seller pursuant to a rescission of the sale based on redhibition. The trial court granted Ford's motion.
Premier's reconventional demand against Fly for a deficiency judgment was heard by the trial court outside the presence of the jury, and Premier was awarded $16,652.02 plus interest at the rate of 11.95% from December 4, 1992, together with 25% attorney fees, subject to a credit of $5,758.26 for the net proceeds of the sheriff's sale on October 27, 1993. The matter then proceeded to trial before the jury on the quanti minoris claim.
The jury rendered its verdict in favor of Fly and against Allstar and Ford.[1] Fly was awarded $12,913.86 as a reduction in the purchase price of the vehicle; $7,079.20 for loss of use, inconvenience, and expenses for accessories; and $9,375 as reasonable attorney fees.
Allstar and Ford appeal this judgment. They contend the trial court erred in admitting testimony about Premier's deficiency judgment against Fly and in allowing plaintiff's counsel to re-open his case to present evidence of attorney fees. They also claim the jury erred in finding the vehicle was defective, in awarding an excessive reduction in the purchase price and excessive amounts for damages and attorney fees.

STANDARD OF REVIEW
The existence of a defect in the product sold is a question of fact to be determined by the trier of fact. Long v. Panther Airboat Corp., 453 So.2d 304, 308 (La.App. 1st Cir.1984). Similarly, the avoidance of a sale or a reduction in the purchase price as a remedy for defects in a product is a factual question, the resolution of which is best left to the trier of fact. Vincent v. Hyundai Corp., 633 So.2d 240, 243 (La.App. 1st Cir. 1993), writ denied, 93-3118 (La. 2/11/94), 634 So.2d 832. A court of appeal may not set aside a fact finder's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1987). Before an appellate court may reverse a fact finder's determinations, it must find from the record that a reasonable factual basis does not exist for the findings and that the record establishes that the findings are clearly wrong (manifestly erroneous). Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993); see Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).

DEFECT
Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice. LSA-C.C. art. 2520.[2] In a suit for redhibition, the plaintiff must prove: 1) the seller sold the thing to him and it is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that, judged by the reasonable person standard, had he known of the defect, he would never have purchased it; 2) the thing contained a non-apparent defect at the time of sale; and 3) the seller was given an opportunity to repair the defect. Vincent v. Hyundai Corp., 633 So.2d at 243. If defects exist which merely diminish the value or utility of the vehicle, constituting a partial failure of consideration, a reduction in the purchase price, rather than a rescission of the sale, is the appropriate remedy. LSA-C.C. arts. 2541-44; Id. at 245; Rhodes v. All *762 Star Ford, Inc., 599 So.2d 812, 815 (La.App. 1st Cir.1992).
In this case, since the vehicle could no longer be returned to the seller, the trial court ruled rescission of the sale would be inappropriate and, were any defect found, Fly's recovery would be limited to a reduction in purchase price and recovery of expenses, including attorney fees. This ruling was correct. See Bourne v. Rein Chrysler-Plymouth, Inc., 463 So.2d 1356 (La.App. 1st Cir.1984), writ denied, 468 So.2d 570 (La. 1985). Our initial inquiry, therefore, is whether there is a reasonable factual basis in the record for the jury's finding that the vehicle was defective.
Fly's main complaint after purchasing the truck was the intermittent illumination of the engine warning light. The first time this occurred was on the day after he bought the vehicle, and when he brought it to the dealership, he was told to continue driving the truck. Because the problem continued, he returned to Allstar on July 13 and left the truck there for two days. When he complained again on July 15, he was told to continue driving the vehicle.
Fly testified he took the truck on vacation, but returned ahead of schedule because the engine warning light was still coming on and he noticed difficulties starting the truck in the mornings. He also experienced decreased and erratic gas mileage and an idling problem. He brought the truck to Allstar on July 24, and a new on-board computer was installed. On August 3, he was back at Allstar with the same complaints about the engine warning light and gas mileage. The truck remained at Allstar two or three days. The last time he returned the vehicle to Allstar on August 11, 1992, it remained there three days. Fly testified that when he went to Allstar to retrieve his truck after the last repair attempt, he noticed the engine warning light came on again as the truck was being brought to him. He told Allstar personnel he did not care to keep the truck and left the vehicle at the dealership.
Fly testified he liked everything about the truck, but felt he could not depend on it. He was concerned because Allstar could not repair the engine light problem, despite repeated efforts. He stated he did not remember any Allstar personnel telling him there were no concerns with the "drivability" of the truck; he only recalled being told to continue driving the vehicle. Fly admitted the truck never experienced a mechanical failure during the time he had it, although it had some other problems, including difficulty in "cold starting," erratic gas mileage, rough engine idle, and brake noise.
Charles Berry ("Berry"), service manager at Allstar, testified the cause of the intermittent illumination of the engine warning light was a minor glitch in the computer system. A processor designed to test the heated exhaust gas oxygen components was not functioning properly, and was making adjustments on the basis of misinformation. Berry stated he informed Fly the truck did not have a "drivability" problem; the vehicle was safe to operate and no damage would occur. Berry indicated Ford eventually developed a new processor which eliminated the malfunction. The new processor became available in August 1993; until that time, the problem could not be repaired. In October 1993, the new processor was installed in the truck. Berry indicated this apparently solved the problem since his search of the nationwide computer records showed the truck had not been brought in for warranty repairs since that date.
Ed Lucas ("Lucas"), the district service engineer for Ford, testified he inspected the truck in June 1993. He stated the vehicle performed well and was in excellent shape. Lucas said he had no problem starting the truck and in the 19 miles he drove it, the engine warning light never came on. He testified he inspected the entire truck and could find nothing wrong with it. Lucas further explained the engine light problem was addressed by Ford and its development of a new processor eventually solved the problem. He also noted that even before the new processor was installed, the truck was not dangerous to drive, nor was there any concern that damage to the truck might occur.
Based on our review of the entire record, we find a reasonable basis for the jury's *763 finding of a defect in the vehicle which diminished its value, such that a reduction in purchase price was justified. The engine light problem existed from the day Fly bought the vehicle. It could not be repaired until the manufacturer developed a new component. The new processor was not available until a year after he bought the truck. Although, as Allstar and Ford claimed, the truck may have been safe to drive when they tested it, Fly could never have known whether the warning light was merely "crying Wolf," or if the engine had developed some new and more serious problem. The problem went deeper than the mere annoyance of a light coming on because, as a result of its sensing the exhaust gases incorrectly, the processor was instructing the vehicle to make certain operating adjustments which may have been unnecessary. Although testimony on this point was not well developed, a reasonable jury could conclude these adjustments would have continued until the new processor, which ignored certain data sensors, was installed in the truck. The jury's finding of a defect was supported by the evidence and was not clearly wrong.

REDUCTION IN PRICE AND DAMAGES
The proper amount of price reduction a purchaser may demand in a quanti minoris action is the difference between the actual selling price and the price a reasonable buyer and seller would have agreed upon if they had both known of the defects. Bourne v. Rein Chrysler-Plymouth, Inc., 463 So.2d at 1359; Robert v. Bayou Bernard Marine, Inc., 514 So.2d 540, 546 (La.App. 3rd Cir.), writs denied, 515 So.2d 1107 and 1108 (La.1987). Some of the factors to consider in making an award of price reduction include the number of defects, the frequency and length of attempted repairs of the defects, the inconvenience associated with the repairs, the actual damage, if any, caused by the defects, the actual cost of repairs and the curtailed use of the thing due to its defects. Rhodes v. All Star Ford, Inc., 599 So.2d at 815. A principal element in formulating the amount of the reduction in the purchase price is the cost of repairs. Besse v. Blossman, 521 So.2d 570, 573 (La.App. 1st Cir.1988). If the defects are few in number and quickly and simply remedied, the cost of repairs may well be the only consideration. Menville v. Stephens Chevrolet, Inc., 300 So.2d 858, 861-62 (La.App. 4th Cir.), writ denied, 303 So.2d 186 (La.1974); see also Robertson v. Coleman Oldsmobile, Inc., 451 So.2d 1323, 1326 (La.App. 1st Cir.1984). Non-pecuniary damages, such as those awarded for mental anguish and inconvenience, are not compensable in an action for redhibition unless the evidence and the nature of the contract indicate the purchase was prompted by a significant non-pecuniary purpose. Young v. Ford Motor Co., Inc., 595 So.2d 1123, 1133 (La.1992).[3] When damages are insusceptible of precise measurement, much discretion shall be left to the trial court for the reasonable assessment of these damages. LSA-C.C. art. 1999; see LeMoine v. Hebert, 395 So.2d 353, 355 (La.App. 1st Cir. 1980). The function of the appellate court is to determine whether the trial court's estimate of damages is reasonable. Robert v. Bayou Bernard Marine, Inc., 514 So.2d at 547.
The cash price of the vehicle was $16,647.69. After applying credits for a rebate and net trade-in allowance, and adding sales tax, license and title fees, and extended warranty costs, the actual cost was $16,222.75. Fly paid an additional $430 for accessories for the truck, including convex mirrors, a truck bed liner, and tinted windows. He also paid $757.10 for insurance premiums on the vehicle until it was purchased by Premier. He did not incur any repair costs because all repair work was done under warranty. Fly was deprived of the use of the vehicle for at least eight days while Allstar attempted to repair the computer, however there is no evidence this loss of use caused him pecuniary damage. See Robertson v. Coleman Oldsmobile, Inc., 451 So.2d at 1327.
*764 The problems of decreased gas mileage, rough idling, and difficulty with cold starts were relatively minor and were repaired as they arose. Fly's main grievance was the faulty engine warning light, which did not prevent him from using the vehicle. Had he kept the vehicle, the new processor eventually would have eliminated this defect, along with any associated problems. None of these defects were permanent or caused any permanent damage to the truck.
No expert testimony was presented concerning a fair price for a truck with these problems, however Fly opined it was worth no more than $1200. Documents introduced by Premier show the truck was appraised before the sheriff's sale by two appraisers, one of whom valued it at $12,000 and the other at $11,500. The new processor had not yet been installed in the truck when it was appraised. In November 1993, after the new processor had been installed, Premier sold the truck to a third party for $10,130.
We find the jury abused its discretion in awarding a $12,913.86 reduction of the purchase price of this vehicle. When sold by Premier for $10,130, the truck was over a year old and had undoubtedly depreciated in value. However, the defect had been repaired and all the accessories purchased by Fly and installed on the vehicle enhanced its value somewhat. Accordingly, we conclude this amount is a reasonable approximation of the amount a reasonable buyer and seller would have agreed upon at the time of the initial sale, had both known of the defect.[4] Giving Fly every conceivable benefit for his out-of-pocket expenses, the cost of the vehicle to him was $17,409.85.[5] Thus a reduction in the purchase price in the amount of $7,300 would adequately compensate Fly for the diminished value of his vehicle.
The jury also erred in awarding the amount of $7,079.20 for loss of use, inconvenience, and expenses for accessories. We find no additional damages are appropriate for these items. This court considered the cost of the accessories on the truck in computing the appropriate reduction in price. There was no evidence of pecuniary damages attributable to loss of use. The nature of the contract in this case does not indicate, nor do the facts and circumstances surrounding the purchase of the truck show, Fly purchased it for a significant non-pecuniary purpose. Accordingly, an award of non-pecuniary damages for inconvenience was and is inappropriate.[6]

ATTORNEY FEES
Ford and Allstar maintain when Fly rested his case without presenting evidence of attorney fees, defendants' motion for a directed verdict should have been granted. Instead, the trial court denied the motion and allowed Fly to reopen the case to introduce an affidavit pertaining to attorney fees. Ford and Allstar contend the trial court erred in doing so; however, a trial court's decision to reopen a case for additional evidence is discretionary and will not be disturbed absent a clear abuse of discretion. LSA-C.C.P. arts. 1631, 1632; Malbrough v. Wallace, 594 So.2d 428, 439 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La. 1992). Defendants were aware from the pleadings and pre-trial inserts that this claim was being asserted by the plaintiff and a copy of counsel's time records had been provided to them before the trial. We do not find an abuse of discretion by the trial court *765 under the facts and circumstances of this case.
Ford and Allstar next argue the jury abused its discretion in awarding $9,375 as reasonable attorney fees. We agree. In determining the award of attorney fees, factors to be considered include the degree of professional skill and ability exercised, the amount of the claim, the amount recovered for the plaintiff, and the time devoted to the case. Dunn v. Redman Homes, Inc., 411 So.2d 722, 727 (La.App. 3rd Cir.1982). This redhibition case presented no complex or unique issues. Plaintiff's counsel conducted minimal discovery. He did not depose any of defendants' witnesses; there were no experts involved on behalf of plaintiff. Counsel's affidavit indicates he participated in the customary negotiations for this type of case. During a six-month period in 1993, there was no activity in the case except for a request for a status conference. Counsel did not prevail against the defendants' motion to continue the trial and a motion in limine. The trial itself lasted three days.
The affidavit shows 108 hours of legal work, but many of the time entries are for counsel's involvement in the executory process litigation between Premier and Fly. Other entries relate to Fly's attempts to maintain a good credit record. These efforts consumed at least 20 hours of counsel's time. While related factually, those legal costs cannot be imposed on the defendants in this case. A significant amount of time was also devoted to the "trade assistance" process, trying to reach agreement on a substitute vehicle for Fly.
There is nothing in the record showing a fee agreement between Fly and his attorney or indicating an hourly rate which might be appropriate for this type of work. A very generous contingency fee of 40% of the amount ultimately recovered for plaintiff would yield an attorney fee of $2920. The outcome, though it awards plaintiff a reduction in price of $7300, certainly does not justify an award of attorney fees in excess of that recovery. Based on these factors, and considering the deference due to the jury award, we conclude an award of $4500 in attorney fees to plaintiff's counsel would be reasonable compensation in this matter.

DECREE
For the foregoing reasons, the judgment of the trial court rendered in accordance with the jury verdict is amended to reflect an award of a reduction in the purchase price of $7300. This award includes an amount attributable to the cost of accessories, but does not include loss of use or inconvenience damages. The judgment is further amended to award attorney fees in the amount of $4500. In all other respects, the judgment is affirmed. Each party is to bear its respective costs for this appeal.
AMENDED AND, AS AMENDED, AFFIRMED.
SHORTESS, J., concurs.
NOTES
[1] Fly's claim against Premier was dismissed.
[2] The section of the Louisiana Civil Code governing redhibition, LSA-C.C. arts. 2520 et seq., was amended by Acts 1993, No. 841, § 1, effective January 1, 1995. Because the vehicle was purchased in 1992, the law in effect at that time governs and all references herein will use the language of the articles prior to revision. Accord, Palomo v. LeBlanc Hyundai Partnership, 95-278, p. 8 (La.App. 5th Cir. 10/31/95), 665 So.2d 414, 420, writ denied, 96-0399 (La. 3/22/96), 669 So.2d 1214.
[3] Although the Rhodes court listed "inconvenience associated with the repairs" as a factor to consider, that case was decided March 19, 1992; the Young case was decided by the Louisiana Supreme Court on March 2, 1992, and the reported decision may not have been generally available when Rhodes was being considered. However, the guidelines in Young concerning non-pecuniary damages in redhibition cases are, of course, dispositive on the issue.
[4] At least one court stated the resale price is not necessarily dispositive of the price a reasonable buyer and seller would have agreed upon had they known of the defects at the time of the sale. See Chalmers v. Stephens Chevrolet, Inc., 461 So.2d 395, 399 (La.App. 4th Cir.1984). However, while we recognize the appropriate price reduction may not be directly related to the resale price in every case, in the absence of any other evidence, it may be probative.
[5] This includes the accessories and insurance costs which he paid. We note the only case to address the insurance costs in connection with a redhibition claim did not reach the issue because it was not preserved for appeal. See Palomo v. LeBlanc Hyundai Partnership, 95-278 at 10, 665 So.2d at 421. We include these amounts here to give the greatest possible deference to the jury award.
[6] Since we rule that the jury abused its discretion in its award of these damages, we find it unnecessary to rule on the issue of the admissibility of the Premier judgment or its prejudicial effect, if any.