## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 05-193

JOSEPH MALMAY

VERSUS

WESTERN STAR TRUCKS, ET AL.

**********

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 54,762
HONORABLE ROBERT E. BURGESS, DISTRICT JUDGE

**********

### MARC T. AMY
### JUDGE

**********

Court composed of John D. Saunders, Oswald A. Decuir, and Marc T. Amy, Judges.

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.**

Colvin G. Norwood, Jr.
McGlinchey Stafford, PLLC
643 Magazine Street
New Orleans, LA   70130
(504) 586-1200
COUNSEL FOR DEFENDANT/APPELLANT:
    Western Star Truck Sales, Inc.

Charles D. Soileau
Soileau & Garcie, L.L.C.
730 San Antonio Avenue
Many, LA   71449
(318) 256-0076
COUNSEL FOR PLAINTIFF/APPELLEE:
    Joseph Malmay

AMY, Judge.

A truck purchased for the plaintiff's logging business suffered a number of mechanical problems, eventually leading the plaintiff to file suit in redhibition. The trial court found the presence of redhibitory defects, warranting a reduction in the sales price. The trial court awarded $36,158.58 related to the reduced sales price and $25,121.98 in attorney's fees. The defendant appeals. For the following reasons, we affirm in part, reverse in part and remand with instructions.

## Factual and Procedural Background

The plaintiff, Joseph Malmay, purchased a 1996 heavy duty diesel truck from Texarkana Truck Center, Inc. d/b/a Shreveport Truck Center (hereinafter Shreveport Truck) in September 1996. The previously owned vehicle had approximately 13,000 miles on the odometer at the time of the purchase. Mr. Malmay purchased the truck for $69,570.00 and began using it in his logging business.

Due to repeated breakdown, particularly those related to engine problems and broken pistons, the truck was repeatedly returned to the Shreveport Truck for repairs. These repairs were made under warranty. As outlined in the plaintiff's brief, an outline supported by evidence and testimony, the truck was repaired as follows:

> [R]eplacement of the camshaft at 12,000 miles, the fuel injector pump at 12,000 miles, head group/cylinders at 12,000 miles, the fuel injector lines at 13,000 miles, the block and cylinder covers at 74,000 miles, the fuel injection pump at 106,000 miles, the fuel injector valves and lines at 130,000 miles, the crankshaft and main bearing at 131,000 miles, another fuel injector pump at 131,000 miles, impeller at 141,000 miles, a piston at 174,000 miles, the camshaft at 207,000, piston and rod rings at 254,000 miles, camshaft at 343,000 miles, fuel injector pump at 350,000 miles, broken piston at 355,000 miles, engine oil leak at 356,000 miles, fuel injector pump at 355,000 miles, fuel injector pump, various new gaskets seals, ring and cylinder liner at 368,000 miles[.]

According to Mr. Malmay, after the truck again experienced a broken piston following the expiration of the warranty, in February 2001, he "parked" the truck rather than pay for repairs himself.

The plaintiff filed the instant matter in January 2002 alleging redhibitory defects. He sought rescission of the sale, or alternatively, damages related to the alleged defects. Western Star Truck Sales, Inc. (hereinafter Western Star), the truck's manufacturer, was named as a defendant, as was Shreveport Truck Center, the truck's seller. In addition to the claim in redhibition, the petition contained a claim against Shreveport Truck for negligent repair. Shreveport Truck filed a third party demand against Caterpillar, Inc., the truck engine's manufacturer. By joint motion of the plaintiff and Shreveport Truck, the claim for negligent repair was dismissed in February 2004. Furthermore, on February 20, 2004, on joint motion of the plaintiff and Shreveport Truck, the trial court dismissed the entirety of the plaintiff's claim against Shreveport Truck due to what the parties termed "an amicable settlement[.]" The plaintiff's claims against the remaining parties were reserved. Due to Caterpillar's presence solely through Shreveport Truck's third party demand, it too was dismissed at the time of trial.

The matter against Western Star proceeded to a bench trial in August 2004. The trial court found in favor of the plaintiff, finding that the evidence established the presence of redhibitory defects. Damages in the amount of $36,168.58 plus interest and attorney's fees in the amount of $25,121.98 were awarded.

Western Star appeals, assigning the following as error:

1. The trial court erred in finding that plaintiff had proven that his truck was redhibitorily defective when it left Western Star.

2. The trial court erred to the extent it may have awarded plaintiff nonpecuniary damages.

3. The trial court erred to the extent it may have awarded plaintiff damages for economic loss.

4. The trial court erred to the extent it awarded plaintiff any reduction of his purchase price of the truck.

2

5.    The trial court erred in awarding plaintiff $36,168.58 as a reduction of his purchase price of the truck.

6.    The trial court erred in awarding plaintiff $25,121.98 in attorney's fees.

The plaintiff also requests attorney's fees for work performed on appeal.

**Discussion**

*Redhibition*

In its first assignment of error, Western Star contends that the trial court erred in finding that the plaintiff established the presence of redhibitory defects at the time the vehicle left the Western Star facility. In particular, it points out that the truck was purchased after having been previously used, that many of the complained of repairs were made under Caterpillar's warranty, and that the plaintiff used it for more than five years and logged over 450,000 miles after its purchase. Western Star acknowledges testimony indicating that the engine problems encountered were more than would have been expected for this type of engine, but states that other testimony indicated that there could have been other causes of the problem. In its brief to this court, Western Star argues that: "[U]pholding the judgment would tacitly relieve a plaintiff in redhibition from proving *anything* other than that a mechanical thing gave mechanical problems throughout its life, and it would judicially extend a manufacturer's written warranty indefinitely."

With regard to redhibition, La.Civ.Code art. 2520 indicates that:

The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.

A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.

3

A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.[1]

Furthermore, "[t]he warranty against redhibitory defects covers only defects that exist at the time of delivery. The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time." La.Civ.Code art. 2530.

Although not as extensive, the warranty of La.Civ.Code art. 2520 is applicable to used as well as new things. *Karageorge v. Cole*, 565 So.2d 502 (La.App. 2 Cir. 1990). Used things must operate "reasonably well for a reasonable period of time." *Id.* at 508. *See also Wagnon v. Hebert*, 520 So.2d 1136 (La.App. 3 Cir. 1987).

A trial court's determination as to the existence of a redhibitory defect is factual in nature and will not be reversed absent manifest error. *Ollis v. Miller*, 39,087 (La.App. 2 Cir. 10/29/04), 886 So.2d 1199; *Gaston v. Bobby Johnson Equip. Co.*, 34,028 (La.App. 2 Cir. 11/3/00), 771 So.2d 848; *Parker v. Dubus Engine Co.*, 563 So.2d 355 (La.App. 3 Cir. 1990). Our review of the record reveals no manifest error in the trial court's finding of redhibitory defects.

Mr. Malmay explained that he purchased the Western Star truck for his logging business and that it was delivered to the dealership for repeated repairs during the 500,000 mile warranty period. He explained that repeated piston scalding or "galding" was the most serious of the truck's engine problems. Each time the truck required repair, it would be removed from service. Mr. Malmay confirmed that he

---

[1] Louisiana Civil Code Article 2541 also provides that:

A buyer may choose to seek only reduction of the price even when the redhibitory defect is such as to give him the right to obtain rescission of the sale.

In an action for rescission because of a redhibitory defect the court may limit the remedy of the buyer to a reduction of the price.

had driven "a lot" of logging trucks, but denied that he had encountered one with similar piston failure.

Glen Kernagan, a service manager at Shreveport Truck Center until 2001, was qualified as an expert in diesel mechanics. Mr. Kernagan testified regarding the truck's repair history and provided explanation as to a Caterpillar report that tracked and reported a vehicle's repairs under warranty.

Mr. Kernagan noted that the first repair reported was to a fuel injection valve line in January 1996, when the truck had mileage of 13,601. Also in January 1996, the truck underwent repairs to the camshaft assembly and the fuel injection pump. Mr. Kernagan confirmed that these repairs were made early in the truck's life and that they relate to pressure inside of the cylinder that can cause damage to the pistons. He continued review of the repairs, noting that an oil leak had been repaired at 74,279 miles and that the timing advance unit was replaced after breaking at 106,489 miles. Mr. Kernagan confirmed that this latter problem could have affected the pistons. Again, in September 1997, at 130,491 miles, an oil leak within the engine was repaired. He confirmed this repair could have affected piston breakage. The next work occurred at 131,000 miles when the rear crankshaft seal and the water pump impeller were repaired. Mr. Kernagan testified that these repairs are not typically required of a truck with similar mileage. He explained that the repairs incurred up to that point were more than that which would be expected of a Caterpillar engine.

When the truck reached 174,899 miles, it sustained a broken piston. Mr. Kernagan explained that broken pistons were not typical of a different model of Caterpillar engines with similar mileage, but that "we saw quite a bit of it" in the type of engine in Mr. Malmay's truck. In July 1998, the truck was diagnosed with a faulty camshaft, a problem directly related to the operation of the cylinder head. At that

time, the truck had mileage of 207,341. The truck sustained a second piston failure in January 1999 at 254,752 miles. The fuel pump and camshaft again required repair at 343,125 miles. At 350,000 miles, o-rings on the fuel pump mounting began to leak. A piston again broke at 355,000 miles. At 368,674 miles, a fuel injector pump was replaced.

After the warranty expired, the truck again experienced a broken piston. Although Mr. Kernagan no longer worked at Shreveport Truck at the time of the July 2001 breakdown, he examined the truck at Mr. Malmay's request. He testified that he did not recommend that Mr. Malmay change the pistons at his own expense as he did not think that changing the pistons would solve the problem. Recalling his conversation with Mr. Malmay, Mr. Kernagan testified:

> [Mr. Malmay] had called me to go by and listen to it. I did. I listened to the engine. He's got a galded piston in it. He asked me about overhauling. I told him I didn't recommend it. He said why. I said because this engine I've just seen repeated failures in this particular - I don't know how many of those engines was manufactured but there weren't a lot. It was just a stepping stone to get to the electronic engine. Some people refused to go electronic and wanted to use the old mechanical engine. I advised Joe to replace the engine was my advice to him at that point. I'd priced an engine. To my knowledge today, a 8PN prefix is not available in a re-manufactured engine from Caterpillar.

When asked whether the list of repairs examined in court were "the types of things that occur under normal use absent a defect[,]" Mr. Kernagan responded: "No sir." He also stated that the failure rate experienced by the truck was not an acceptable one in the industry. Upon questioning by the trial court, Mr. Kernagan again explained that he felt that this engine's repair record was beyond that which would be common. When asked by the trial court about the common failure rate among logging trucks, Mr. Kernagan stated: "[I]t's not uncommon to see an internal engine failure with an

6

engine in 500,000 miles. And that's why the coverage is, you know, we sell a five year 500,000 mile coverage to cover the consumer."

Similarly, Raymond Ezernack, an expert in diesel mechanics, testified that, although he did not service the truck, he diagnosed it a number of times. The related warranty work would then be performed at Shreveport Truck. Mr. Ezernack stated that he would recommend replacement of the engine rather than an overhaul of the engine as it was not "a lemon, it's a bad lemon." When asked about the life expectancy of a diesel truck before an overhaul is required, he explained that "four or 500,000 [miles] is nothing." He testified that he had encountered trucks with well over this type of mileage.

Western Star presented the testimony of Michael Thornton, a manager with Caterpillar who acts as a liaison between the company and truck manufacturers, and who also served as a "team leader" in the development of the vintage of engine at issue. Although he testified that this series of engine was satisfactory in terms of the general range of Caterpillar engines, he further acknowledged that he did not like to see the repair history experienced by this truck.

Given the above testimony regarding the truck's repeated failures, the trial court was not manifestly erroneous in concluding that redhibitory defects existed and that they existed from the time of the manufacture of the engine. The problems commenced relatively early in the truck's life and continued to occur. Testimony was presented indicating that these problems were beyond those that would be expected for diesel engines. Certainly, given the expected life of the truck's engine, the trial court did not err in concluding that problems commencing within 13,000 miles and continuing thereafter indicated that the defects existed at the time of its manufacture

and that recurrence after the plaintiff's purchase was within a reasonable period of time. *See Wagnon*, 520 So.2d 1136.

As for Western Star's argument that the truck was improperly maintained or abused, the trial court apparently discounted this defense. Mr. Malmay explained his maintenance habits and denied that the truck was overworked or that it was operated with low fluid levels. Furthermore, repair was never denied under the warranty due to an allegation of misuse. Mr. Kernagan explained that warranty work is denied in situations of abuse or poor maintenance. He denied that any repairs to Mr. Malmay's truck were refused due to maintenance issues and stated that there was nothing to suggest that the truck was subjected to anything other than normal use. Additionally, defense expert Michael Thornton explained that he could not conclude that neglect or misuse caused the piston failure in the truck. Given the totality of this evidence, the trial court was free to accept the version of events presented by the plaintiff and discount the defense theory of abuse to the truck.

This assignment lacks merit.

*Damages*

Western Star next questions the trial court's award of $36,168.58 to the plaintiff. Although no written reasons identify the elements of the trial court's lump sum award, it is clear from the quantum awarded that the trial court found a reduction in the sales price appropriate rather than a rescission of the sale. Western Star makes alternative arguments as to what the award should not include. For example, it contends that consideration of nonpecuniary damages would be inappropriate. It also questions the sufficiency of the plaintiff's evidence as to economic loss, arguing that there was insufficient proof of such loss either to Mr. Malmay personally or to the business.

8

As seen above, La.Civ.Code art. 2541 provides for the reduction of the sales price of an item with a redhibitory defect. This remedy permits the recovery of the difference between the original sales price and the price that a reasonable buyer would have paid if he or she had been made aware of the defects. *Destefano v. Crump*, 96-951 (La.App. 5 Cir. 4/9/97), 694 So.2d 424, *citing Capitol City Leasing Corp. v. Hill*, 404 So.2d 935 (La.1981). Factors to be considered in determining the quantum to be awarded in price deduction cases "include the number of defects, the frequency and length of attempted repairs of the defects, the inconvenience associated with the repairs, the actual damage, if any, caused by the defects, the actual cost of repairs and the curtailed use of the thing due to its defects." *Fly v. Allstar Ford Lincoln Mercury, Inc.*, 95-1216, pp. 6-7 (La.App. 1 Cir. 8/21/96), 690 So.2d 759, 763. *See also Rhodes v. All Star Ford, Inc.*, 599 So.2d 812 (La.App. 1 Cir. 1992). A trial court's determination as to the quantum of recovery is not to be modified on appeal absent an abuse of discretion. *Karageorge v. Cole*, 565 So.2d 502 (La.App. 2 Cir. 1990).

We begin review of this portion of the defendant's brief by again noting that there is no indication that written reasons were requested of the trial court, nor are any contained in the record.[2] While Western Star approaches its arguments as if separate damages were awarded, damages that would require the type of precision urged by Western Star, our review indicates that the $36,168.58 is supported by the record as

---

[2] At the close of the trial, the court observed that it did not feel that the evidence supported rescission of the sale, but that the case was one for damages. The trial court stated:

> I do think this is not a rescission case. It is a reduction case or it is a damage claim and that's the question. It is that component that I'm primarily looking at. I think there are certain damages here that should be considered. I think the testimony established by a preponderance of the evidence that there was a defect attributable to Western Star trucks but not rising to the level of recision [sic] but rather a compensation, be it reduction of price or damages, however that plays out.

9

a reflection of the reduction in the $69,570.00 sales price. In light of the relatively subjective factors enunciated in *Fly*, 690 So.2d 759, we find the quantum awarded by the trial court supported by the record.

Rene Malmay, Mr. Malmay's wife, was responsible for the bookkeeping of the logging business. She explained that the $69,570.00 purchase price was financed and that $29,822.42 was paid in interest. The record indicates that the truck experienced numerous breakdowns as seen in the recitation of repairs. Although these repairs were covered by the warranty, it cannot be said that these difficulties would have had no effect on the sales price had the plaintiff known of them at the time of purchase. Even prior to the final failure, each repair took the truck from service.

According to Ms. Malmay's records and calculations, the truck was out of service for as many as seventy-seven days before the final piston failure that caused the plaintiff to "park" the truck. The calculation does not include days that otherwise would have been lost through poor weather or the occurrence of holidays. Ms. Malmay explained that the net daily profit from the truck was $340.00. This figure reflects daily deductions of approximately $60.00 in fuel and $125.00 for the truck's driver. Had the trial court accepted this version of events, this factor, alone, could have accounted for a sizeable portion of the trial court's $36,000 award; perhaps even the majority. Although Western Star points to other expenses that would have arguably created less of a daily net profit, such as maintenance and insurance, the trial court was able to consider this relatively minor type of expenditure in considering the degree to which lost income would have factored into the price a reasonable buyer would have paid for the truck had he or she known of the defects. We also point out that the above figures related to lost profits during the existence of the warranty. However, the truck was entirely removed from service after the final piston failure in

10

November 2001. Certainly this ultimate loss of service, absent a costly repair, could factor into a lesser sales price.

Further, as seen by reference to *Fly*, 690 So.2d at 763, "[a] principal element in formulating the amount of the reduction in the purchase price is the cost of repairs." Most of the repairs were covered by the warranty. However, in January 1999, when the truck had a piston replaced, Mr. Malmay replaced the remaining pistons as a precautionary measure on the advice of Mr. Kernagan. This replacement was not covered by the warranty and cost $1,908.58. The trial court's consideration of this element can be seen in its $36,168.58 award. Testimony was also introduced as to the cost associated with repairing the truck after the final piston failure in November 2001. Mr. Kernagan opined that replacement with a new engine would be the optimal method of repair. He explained that replacement would range from $20,000.00 to $25,000.00, depending upon the model installed.[3] Given these figures, the trial court could have correctly included $26,908.58 for the costs of repairs in calculating the award for the reduced sales.

Between evidence related to lost income from the truck being out of service and testimony regarding costs of repairs needed, the $36,168.58 awarded by the trial court is supported by the record.

This assignment of error lacks merit.

*Party Sustaining Damages*

Mr. Malmay, in his personal capacity, filed the petition in the instant matter and the judgment was entered in his favor. Western Star contends that Mr. Malmay failed to prove that he, personally, suffered damages related to the vehicle. Rather,

---

[3] Even an overhaul of the engine, a method of repair Mr. Kernagan did not recommend, would cost approximately $12,000.00. Whether the trial court found the relevant repair to be replacement with a new engine or the overhaul to be necessary is not decided on review. Rather, the record supports the consideration of as much as $25,000.00 regarding replacement costs of the engine.

11

Western Star contends that tax returns indicate that Mr. Malmay's personal income increased over the years and, furthermore, that income from the truck only benefitted Mr. Malmay's business, Joe Malmay Timber Harvesters, Inc. Thus, Western Star contends that the judgment in the plaintiff's favor must be reversed.

The record indicates that Mr. Malmay personally purchased the Western Star truck and it remains in his name. Joe Malmay Timber Harvesters, Inc. did not come into existence until well *after* the truck was purchased. Furthermore, the business is an "S Corp." wholly owned by Mr. Malmay and his wife. The record is clear that income was lost due to the truck's service record. This is true whether the income would have been immediately realized by Mr. Malmay, as it would have after the initial purchase, or would have been received by Mr. Malmay in his salary from the corporation. We are not persuaded by Western Star's assertion that lost income was not proven as income tax returns indicate that Mr. Malmay's income increased through the years. Testimony was clear that, when the truck was out of service, income was lost, whether through missed loads or through the use of a replacement truck that could have been earning income elsewhere.

Again, we point out that we do not review this case as involving an actual award for lost income. Rather, this lost income or "curtailed use of the thing" as discussed in *Fly*, 690 So.2d at 763, is a factor considered in calculating the reduced sales price of the truck. Mr. Malmay purchased the truck and retained title of the truck in his name. Certainly, had a purchaser known from the outset that the truck's use would have been curtailed to such a degree, this could have been a significant factor in determining the purchase price.

This argument lacks merit.

*Dismissal*

Western Star contends that the trial court's award of damages cannot include a reduction in the sales price as the plaintiff's pretrial settlement with the seller, Shreveport Truck, extinguished any right in this regard. Western Star points to jurisprudence indicating that sellers and manufacturers are treated as solidary obligors. Western Star also references La.Civ.Code art. 1803[4] and contends that the pretrial settlement with Shreveport Truck, "'benefit[t]ed' Western Star as a matter of law, 'in the amount of the portion of' Shreveport Truck." The plaintiff contends that the merits of this argument are controlled, not by La.Civ.Code art. 1803, but by La.Civ.Code art. 2531.

As the issue of liability between solidary obligors and any necessary reduction in the amount of judgment was neither raised below nor addressed by the trial court, we do not address the merits of the argument in this review. *See* Uniform Rules – Courts of Appeal, Rule 1–3 (providing that "[t]he Courts of Appeal will review only issues which were submitted to the trial court . . . .").

This assignment lacks merit.

*Attorney's Fees*

In its final assignment of error, Western Star questions the $25,121.98 awarded in attorney's fees.[5] Western Star contends that the quantum awarded is excessive as

---

[4] Louisiana Civil Code Article 1803, entitled "Remission of debt to or transaction or compromise with one obligor," provides:

> Remission of debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligor.

> Surrender to one solidary obligor of the instrument evidencing the obligation gives rise to a presumption that the remission of debt was intended for the benefit of all the solidary obligors.

[5] As the defendant is the manufacturer, attorney's fees are available in the present case through operation of La.Civ.Code art. 2545, which provides:

the judgment awarded only $36,168.58 on the merits of the claim. Western Star also challenges the award procedurally, as it was not allowed to traverse the plaintiff's statement as to attorney's fees at a hearing. A request for such a hearing was denied and is contained in the record.

Without commenting on the appropriateness of the fee, we note that Western Star's objection to the billing records submitted by the plaintiff's attorney was brought to the trial court's attention. However, a motion to set the matter for hearing was denied. We conclude that this denial was an abuse of discretion given the presence of multiple parties and Western Star's desire to probe the reasonableness of the entries. Accordingly, we reverse the award of attorney's fees and remand this matter for the trial court to set a hearing at which the parties' respective arguments regarding the fees can be heard. The trial court is then ordered to impose attorney's fees as the case requires.

*Attorney's Fees on Appeal*

In its brief to this court, the plaintiff asks for additional attorney's fees for work performed on appeal. However, the plaintiff neither answered the appeal nor filed a separate appeal. Accordingly, an award for additional attorney's fees is inappropriate. *See* La.Code Civ.P. art. 2133.

---

A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.

A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.

14

**DECREE**

For the foregoing reasons, the trial court's award of $36,168.58 is affirmed. That portion of the judgment awarding attorney's fees is reversed and the matter is remanded to the trial court for a hearing and imposition of attorney's fees as explained above. All costs of this proceeding are assessed to the appellant, Western Star Truck Sales, Inc.

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.**