CARAWAY, J.
liThe owner of a wood-frame building sued the Town of Rayville and its mayor for wrongful demolition damages after town employees erroneously demolished the building. The trial court awarded $5,000 for contents and salvage lumber. The owner appeals the judgment. We affirm.

Facts

On July 9, 2012, employees of the Town of Rayville, Louisiana (the “Town”), demolished Morgan Moss’s 1900 square-foot wooden building located at 200 Spruce Street. The building was located across the street from Moss’s home. Moss claimed that he had not received notice of the planned demolition and was alerted to the work by the noise after the destruction had begun. He was able to record 42 minutes of the demolition on a flip camera[1] and took still photographs as well. Thereafter, Moss left the scene and approached Rayville Mayor Harry Lewis, demanding that he take care of the problem. Lewis claimed to know nothing about the situation and directed Moss to the public works director in charge of demolition, Lorenzo Brown. Moss claimed that he was informed that the building was randomly chosen to be tom down.
The entire structure and its contents were destroyed. Moss, an accountant, claimed that he used the building for stor *812 ing important documents and historical records, including client files and research papers, equipment, furniture, books, video machines, store fixtures and cabinets, computers, tools, coins, merchandise from, a previous retail business and'bother irreplaceable valuables. A few days after the demolition, city employees spread the pile of rubble so that Moss could attempt to salvage personal items. Moss prepared a written inventory of the items in the building.
On July 8, 2013, Moss instituted suit against the Town of Rayville and Mayor Lewis for the wrongful demolition of the building seeking compensatory and punitive damages.[2] After a one-day bench trial, judgment in favor of Moss in the amount of $5,000[3] was rendered. This appeal by Moss ensued.
On appeal, Moss argues that the trial court awarded insufficient damages for actual loss and erred in denying damages for mental distress and inconvenience.[4]

Discussion

Under La. C.C. art. 2315, a person may recover damages for injuries caused by the wrongful' act of another. Hornsby v. Bayou Jack Logging, 04-1297 (La.5/6/05), 902 So.2d 361. A person injured by trespass or fault of another is entitled to full indemnification for the damages caused.' Id.
In a suit, for damages, it is the plaintiffs burden to prove the damage he suffered as the result of the defendant’s fault. Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70. Generally, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value ’ of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the .property or economically wasteful, unless there is. a reason personal to the owner, for restoring the original condition or there is reason to believe that the plaintiff will make the repairs, damages are measured only by the difference between the value of the property before and after the harm. Hornsby, supra, citing, Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Serv. Co., 618 So.2d 874 (La.1993).
It has been held that a plaintiff bears the burden of proving with legal certainty every item of damages and that the plaintiffs own uncorroborated “personal estimate” of loss is insufficient to satisfy that burden. See Blake v. City of Port Allen, 14-9528 (La.App. 1st Cir.11/20/14), 167 So.3d 781; George v. Pigno, 97-127 (La.App. 3d Cir.6/4/97), 696 So.2d 186, writ denied, 97-1798 (La.10/13/97), 703 So.2d 620; Tudor Chateau Creole Apartments Partnership v. D.A. Exterminating Co., 96-0951 (La.App. 1st Cir.2/14/97), 691 *813 So.2d 1259; Parker v. Dubus Engine Co., 563 So.2d 355 (La.App. 3d Cir.1990); Anderson v. Heck, 554 So.2d 695 (La.App. 1st Cir.1989), writ denied, 558 So.2d 605 (La.1990), cert. denied, 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990).
|4In Louisiana, damages for mental distress may be recoverable in tort as the result of a defendant’s negligent infliction of emotional distress, occurring when the plaintiff does not suffer personal injm ry. Moresi v. State, Through Dept. of Wildlife & Fisheries, 567 So.2d 1081 (La.1990); Covington v. Howard, 49,135 (La.App.2d Cir.8/13/14), 146 So.3d 933, writ denied, 14-1927 (La.11/21/14), 160 So.3d 973. Courts have allowed recovery for mental distress for the negligent damage to one’s property while the plaintiff was present and saw his property destroyed. This is one type of case that can involve the “especial likelihood of genuine and serious mental distress” which serves as a guarantee that the claim is not spurious. Moresi, supra; Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955); Lambert v. Allstate Ins. Co., 195 So.2d 698 (La.App. 1st Cir.1967); Holmes v. Le Cour Corp., 99 So.2d 467 (La.App.Orleans 1958). See also, Sandrock v. St. Bernard Parish Gov’t, 14-1019 (La.App. 4th Cir.5/27/15), 171 So.3d 1039; Blache v. Jones, 521 So.2d 530 (La.App. 4th Cir. 1988); Trahan v. Florida Gas Transmission Co., 208 So.2d 550 (La.App. 3d Cir.1968); Hayward v. Carraway, 180 So.2d 758 (La.App. 1st Cir.1965), writ refused, 248 La. 909, 182 So.2d 662 (1966). However, the mental anguish must be a real mental injury. The usual worry over consequences of property damage will not justify an award for mental anguish damages. See, Covington, supra.
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Wainwright, supra. Special [^damages are those which theoretically may be determined with relative certainty. Kaiser v. Hardin, 06-2092 (La.4/11/07), 953 So.2d 802. An appellate court, in reviewing a special damage award, must satisfy a two-step process based on the record as a whole:, there must be no reasonable factual basis for the award, and the finding must be clearly wrong. Kaiser, supra.
The Town presented no defense that it had any authority to cause the demolition of the property. The trial court ruled “[t]here was no intent on the part of the Town of Rayville to destroy property that they had no right to destroy, it was done in error, and the Town has accepted responsibility. Thus liability is not at issue.”
Regarding proof of damages at trial, David Standifier, a Town employee, testified that, on July 9, 2012, he participated in the demolition of Moss’s building as a trackhoe driver. He testified that after “tearing down a house up the road,” his supervisor, Lorenzo Brown, “told us that [Moss’s] was the next one on the list.” The Town did not produce a copy of the list.
Upon arriving at ■ the site, Standifier waited about 30 minutes' for a dozer to arrive. During that time, he checked inside the building to máke suré nobody was inside. As required, he also separated metal items obtained from the building to go to the landfill. Afterwards, hé and the dozer operator began * to' demolish the building. ■
Standifier .testified that the building “was [in] bad shape. It was leaning to one side.” He stated that it had no electricity, water and was “just an ole-abandoned house to me.” The roof “was leaning,” so far that | ¿‘Entergy cut the line on it,” to *814 prevent electrocution because it “was low.” Standifier testified that he “could jump on top of the roof,” and that the building was “almost” sitting on the ground.
When shown a photograph of the building from 2008,[5] Standifier testified that it was “worse, a lot,” “than that at the time we got to it.” He stated that it would be easy for the public to access the building. In Standifier’s opinion, the house was unsafe and about to fall down because it fell down as he began to demolish it. From his observations, the structure was clearly leaking.
Standifier testified that the trackhoe he drove was loud and made a beeping sound when he backed up. He recalled that Moss lived very close to the building and would have been able to hear the backhoe arrive some 30 minutes before he began work. The same was true of the bulldozer, which was “louder” than the trackhoe.
Standifier testified that Moss never asked him to stop the demolition process. If he had, Standifier would “have stopped and I’d a called my supervisor.” He conceded that if the building was not on the Town’s list “we should not be here.”
Michael Lawson, the dozer operator, also identified the 2008 photograph of the building and noted that the roof had caved in by the time of the demolition. He also observed that in the photograph, it looked like part of the building “was off its piers.” The building was the type Lawson would normally tear down. He could look on the top of the roof from the |7ground and described the condition of the building as bad. Lawson testified that it took 40 minutes to destroy it because not much was holding it up. He observed that clothes inside the building were very old.
Moss testified that he is an income tax accountant by trade and owned the building located at 200 Spruce Street, right outside of the Town of Rayville. Moss testified that the building in question was used to store tax records from before he opened his business in Town ten years prior. Additionally, Moss described all of the items contained in the building at the time of demolition. He stated that he had $2,000 worth of merchandise from a retail business he operated out of the building prior to 2004. After the building was demolished, Moss prepared a list of things that were inside. He identified the list he prepared.[6]
Moss received no notice or court order that the building was on the Town’s demolition list. He first knew about it when the demolition began. When he first heard noise, he assumed it was people working on the highway because that type of work had been going on at the time. When he got to his window, however, “I noticed that the city was tearing down the building,” and it “looked like they had torn down the majority of it.” Moss then “got [his] flip-camera” and “started recording the action that was going on.” After his camera ran out, he went outside and took some “still-shots.”
Moss admitted he had no conversation with the people after he started recording. He explained that he did not approach the men because he did [snot think he had authority to stop them and he wanted to *815 get evidence of what was going on. Instead, he later approached the mayor, who referred him to Lorenzo Brown. Brown told him that “they just randomly decide that the building is being torn down.” Moss testified that after the Town employees left the location, they had stacked everything up in a pile. A few days later “the insurance company brought the city back in because I was trying to salvage some of the — the personal things that were there.” The Town employees then “spread it out.”
Moss identified 55 photographs taken of the scene after the demolition and introduced into evidence. Moss testified that the photographs showed “things that were scattered,” including some of the merchandise, a mattress, bedroom set, chairs, videos, books, college records, income tax records and other documentation. Prom the photographs, he identified shirts, computers, a television, electric fans, display cabinets, speakers, records, magazines, and a designer tote bag, refrigerator, bicycle and gas cans.
Moss testified that the building had no electricity at the -time it was torn down. Moss also admitted that while it had plumbing fixtures, the pipes needed repair. He estimated that the cost to replace the building would be $22,000.
Moss valued the “intellectual property” contained in the building at $25,000, and identified that property as an “accumulation of my research,” for books he had written or was writing. He testified that he had some of his research published in two books. He had prepared “a lot” of his research |ain college and it was stored there. Moss explained that “it would take a lot” of “time and resources to reduplicate the research.” Moss claimed to still use some of the research and papers to assist him in ongoing research.
Moss identified photographs of his former retail business from 1985 and identified the subject display cabinets that remained in the building. He testified he planned to use all of the, items depicted in the photographs at some future date; he also actively used some of the things like his saw. He identified 3 receipts (from 1984 and 1987) for items stored in the building. He admitted that the values he placed on the building’s contents were from the time of the purchases of the items years before.
On cross-examination," Moss conceded that the building walls were in need of repair and the roof had some pretty serious problems as well. He agreed that the 2008 photograph was an accurate representation of what the house looked like in 2008. He admitted that at the time the building was torn down, the roof was starting to cave in; he did not know if it had leaked. Moss conceded that “certain sections of the building were on the ground,” and he did not dispute Standifier’s testimony that the building" was in worse shape in 2012 than in the photograph. ' Moss testified that the front door of the building was hard to open. He also agreed that the building was leaning to the west, more than two feet. Moss testified that overall, the building was about to fall down. He stated that he had not been in the building for a year, and he did not know what had been destroyed by weather in that time.
Moss testified that he intended to use the clothing left in the building for resale. He had not paid inventory tax on the clothing 'and the estimates |inof value he provided were based on the cost of the items at the time of purchase. Moss stated that the cabinets inside the house were “very expensive cabinets” and that he used his tools on a regular basis, meaning whenever he needed them. He admitted that if *816 the items had .gotten wet, it would have reduced their value.
Moss testified that his $22,000 estimate for the cost of the building did not reflect what it was worth at the time it was tom down; ' that amount would be $10,000 for material “out of it.” He identified a document reflecting 2011 real estate assessment information from the tax assessor’s office which showed the value of the building at $2,837.33. Moss planned to renovate the building, by tearing it down, putting in a concrete slab and using some of the salvage materials to build a new building. He also could have used the same foundation piers.
Moss’s CD of the demolition was placed into evidence. He testified that at the time he began' filming, the building was almost completely knocked down and there was nothing he could have done. Moss stated that he continued to suffer mental distress over the events even at the timé of trial.
Bob Chandler, insurance adjuster, testified that he handled the insurance claim related to the subject building. He went to the location a couple of days after the demolition took place and confirmed that the house and its contents were in a “big pile.” He had no knowledge of the condition of the building before the demolition. Chandler confirmed that Lorenzo Brown had his men return to the site to spread out the pile of rubble and that |nMoss made an inventory of his personal items. Chandler observed an old couch and a game board that was in poor condition because it had gotten wet more than once; he did not believe it was worth much. Chandler also saw a lot of termite damage in the structure rubble.- He saw three or foui- neckties and a sweater still in cellophane wrapping and tax records from 1980 with smeared ink.
After the presentation of this evidence and testimony, the trial judge took the matter under advisement, later providing reasons for judgment as follows:
All of this evidence-convinces the Court that this building was in deplorable condition on the date of its destruction. The burden is upon-plaintiff to prove the value by a preponderance of the evidence.- The best that has been proven is a nominal value for salvage-lumber that could be used in a possible replacement storage building. The Court will assess the value of the loss at $2,500.Q0.
The plaintiff contends he has lost inventory and personal property due to the actions of the Town of Rayville. The testimony indicates that the contents were repeatedly damaged by water leakage due to the poor .condition of the building. The witnesses .testified that no one would .leave valuables in a building like that, totally unprotected from weather and any person passing by that might wish to go in the building. Plaintiff himself would leave it all unattended for months at a time. This is all totally inconsistent with one have valuables stores in the building. Again the Plaintiff -has • failed in his burden of proof. The Court can only assign a nominal value to the movables within the building. The Court believes the sum of $2,500.00 would be fair and reasonable.
Plaintiff makes a claim for loss of intellectual -property and research. No proof has been submitted except the self serving testimony of the. Plaintiff. The testimony amounts to nothing more than plaintiffs conclusions and requests. This claim will be denied.
Plaintiff makes a claim for mental anguish and distress. No proof has been submitted except the self serving testimony of the Plaintiff. The Court notes that the Plaintiff took forty-two’ minutes *817 of film of the demolition, when a simple walk across the street and, request to stop would have helped alleviate his concerns. He failed to mitigate his | ^damages. This claim for mental anguish and distress will be denied, as well as his inconvenience claim, and any other claim not specifically mentioned.'
At trial, Moss admitted that overall, at the time of demolition, the building was about to fall down. This testimony and the evidence establishes that the cost of restoring the building was disproportionate to its value. Regarding value, Moss conceded that the salvage value of the structure was no more than $10,000, but presented no supporting evidence for his conclusion. From the evidence before it, therefore, the trial court committed no error in awarding actual damages for the building in the amount of $2,500.
In assessing Moss’s special damage claim for the loss of items in the building, the credibility of that- claim was placed in total doubt by the overall circumstances regarding the building. The credibility determination of Moss’s assertions about his property within this accurately described “deplorable” structure is the fact-finder’s domain and not'the appellate court’s. Not only were Moss’s values for these items uncorroborated personal estimates, the asserted values could be rejected because of the items’ obvious deterioration inside the damp and leaking structure for years before this event... The building was also unsecured and open to vandalism, casting a circumstantial cloud over what items of value remained. Accordingly, we do not find that the trial court’s award of $2,500 for any personal items remaining in this building was clearly wrong. There was no reasonable factual basis supporting a higher award for Moss’s special damage-claim. , .
| ^Additionally,. Moss set values of $25,000 for research papers, $15,000 income tax files and $3,500 for a personal library containing books,, CDs, cassettes and newspapers. As noted by the trial-court, . these estimates were based upon Moss’s self-serving evaluations. Moreover, the evidence establishes that Moss’s actions in failing to secure items of such value were inconsistent with his estimations.
Finally we find no abuse of discretion in the trial court’s denial of damages for mental anguish and inconvenience. Moss’s self-serving testimony was insufficient to establish any real mental injury, especially in light of the quality of items destroyed. Moss’s failure to stop the harm demonstrated a lack of genuine concern on his part for any property of value which might give rise to this claim.

Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Moss.
AFFIRMED.

, The DVD admitted into evidence shows that the building had been mostly demolished at the tíme Moss began filming the process.

. The trial judge noted in reasons for judgment, and Moss concedes in brief, thát he is seeking $123,602 in total damages, including $35,000 for mental anguish, $10,000 for inconvenience and $78,602 in actual property loss.

. The amount of the total judgment represented $2,500 for salvage lumber and $2,500 for contents. The court rejected claims for loss of intellectual property and research, mental anguish, distress and inconvenience for lack of evidence and due to Moss’s failure to mitigate his damages.

.Although Moss assigned as error the trial court determination that he failed to mitigate damages, he did not brief that argument. Thus, it is considered as abandoned on appeal. URCA 2-12.4; Gladney v. May, 29,373 (La.App.2d Cir.5/7/97), 697 So.2d 1022, writ denied, 97-2417 (La.1/9/98), 705 So.2d 1101.

. As noted by the trial court, that photograph "clearly shows the dilapidated condition” of the building some four years prior to its demolition.

. The list dated January 2, 2014, set forth items allegedly contained in the four rooms of the building, valued at $54,780. Moss also listed the value of the cost to rebuild at $22,000, debris removal of $2,012 and ground leveling of $2,000 for a total actual cost of $80,792.